INA UNDERWRITERS INSURANCE
COMPANY

v.

Philip NALIBOTSKY, et al.

v.

M.C.M. INSULATION, INC., et al.

Civ. A. No. 81–4545.

United States District Court,
E.D. Pennsylvania.

Sept. 14, 1984.

Robert McL. Boote, Wolf, Block, Schorr & Solis-Cohen, Bernard M. Borish, Mark R. Rosen, Philadelphia, Pa., for plaintiff.

David Kraut, Norristown, Pa., for defendant Philip Nalibotsky.

John F.X. Fenerty, Charleston & Fenerty, P.C., Philadelphia, Pa., for defendant Kravitz.

## MEMORANDUM *

LOUIS H. POLLAK, District Judge.

### I.

In this action, plaintiff INA Underwriters Insurance Company ("INAU") alleges that defendants, certain homebuilders and related individuals and entities, constructed homes within the Lafayette Estates hous-

ing development which contained a variety of defects. The homes in question were warranted by the National Homeowner's Warranty Program for which INAU is the insurer. As a result, INAU paid for repairs to these homes. INAU now seeks to recover those payments from defendants.

During the three years which have elapsed since the filing of the complaint in this action, a large number of documents have been filed with this court but little forward progress has occurred until recently. A preliminary discovery period which ended in late May 1984 resulted in the elimination of a number of superfluous third party defendants. At a conference on June 18, 1984, a final discovery schedule was established which will result in submission of final pretrial memoranda from all parties early in 1985. Three days before the conference was to be held, defendant Philip Nalibotsky filed with this court a motion to disqualify Wolf, Block, Schorr and Solis-Cohen ("Wolf, Block") as counsel for plaintiff. The parties to this motion have submitted numerous briefs on the legal issues presented and affidavits directed to the factual issues raised by the motion. In addition, when it became apparent that further factual development was necessary to allow a proper evaluation of the motion, an evidentiary hearing was held on August 20 and 21. At that time, defendant James Kravitz and the corporate entities names as original defendants in this action joined in the motion to disqualify.

The pending motion argues that Robert Boote, Esq.—the Wolf, Block partner handling INAU's law suit—and his firm should be disqualified from further representation of INAU because some years ago when the Lafayette Estates development was under construction, Mr. Nalibotsky retained Daniel Cohen, Esq., one of Wolf, Block's labor specialists, to deal with two episodes of picketing at the construction site.[1]

---

* This Memorandum supplements the reasons given for my ruling on this motion on the record from the bench on August 27, 1984.

1. If any attorney at a law firm is disqualified from representing a particular client in a partic-

ular matter, the entire firm must be disqualified under the Code of Professional Responsibility, which governs the professional conduct of lawyers admitted to practice in this court.

If a lawyer is required to decline employment or to withdraw from employment under a

## II.

The motion to disqualify was not supported by affidavits or other evidence. The motion and supporting memorandum focused on work done by Mr. Cohen to bring about a prompt cessation of picketing conducted by the Building Trades Committee in the fall of 1976. The targets of the picketing were nonunion subcontractors at the Lafayette Estates development.

Plaintiff's memorandum in opposition to the motion was timely filed. That memorandum was supported by affidavits from both Mr. Boote and Mr. Cohen which stated that Mr. Cohen had represented Mr. Nalibotsky and some of his corporations both in 1976 and 1979.[2] At the time Mr. Boote was preparing to file this action on behalf of INAU, a conflict-of-interest check within the firm revealed this prior representation. After consultation with Mr. Boote and Mr. Cohen, the then chairperson of Wolf, Block's conflict-of-interest committee, the late Louis Goffman, Esq., determined that the prior and current representations were sufficiently unrelated so as to permit Mr. Boote to continue his current representation of INAU.

Defendants' reply brief was supported by an affidavit from Mr. Nalibotsky. In that affidavit he stated that the 1976 representation by Mr. Cohen "continued beyond 1976, and directly involved this project in 1978." Nalibotsky affidavit at ¶ 8. At the

hearing on the motion both Mr. Nalibotsky and Mr. Cohen testified that the 1976 representation ended in November 1976 and that the threat of picketing at Lafayette Estates in 1978 caused Mr. Nalibotsky again to seek assistance from Mr. Cohen. The 1978 representation began in May and ended in June of that same year.[3]

■ It is the responsibility of this court to supervise the conduct of members of its bar. In furtherance of this responsibility, this court has adopted standards for professional conduct in its local rules of civil procedure and enforces those standards through appropriate proceedings. E.D.Pa. R.Civ.P. 14. Rule 14(IV) of the local rules of civil procedure states:

> The Code of Professional Responsibility adopted by this court is the Code of Professional Responsibility adopted by the Supreme Court of Pennsylvania as amended from time to time by that state court, except as otherwise provided by specific Rule of this court after consideration of comments by representatives of bar associations within the state.

Pennsylvania Canon 4 and the Ethical Considerations and Disciplinary Rules thereunder are designed to protect from disclosure the confidences and secrets which a client reveals to his attorney. In particular, Ethical Consideration 4–5 as adopted by the Pennsylvania Supreme Court states:

---

Disciplinary Rule, no partner, associate or any lawyer affiliated with him or his firm may accept or continue such employment. Disciplinary Rule 5–105(D). Thus, if one member of the Wolf, Block firm would be disqualified from representing plaintiff due to prior representation of an adverse party, all attorneys at the firm would be disqualified.

2. Mr. Cohen had counselled Mr. Nalibotsky in December 1978 and January 1979 with regard to Blue Grass Construction Co., a corporate entity under the direction of Mr. Nalibotsky. That representation involved an evaluation of whether Blue Grass Construction Co. should adopt a particular labor agreement which had been negotiated by the Philadelphia Building Trades Council and the Home Builders' Association, an association of builders to which Mr. Nalibotsky belonged and which was represented by Mr. Cohen and the Wolf, Block firm.

Since the disclosure of prior representations by Wolf, Block, the parties have not focused upon this 1978–1979 representation of Blue Grass Construction Co. as a basis for disqualification. Blue Grass Construction Co. was, at the time Mr. Cohen provided this advice, involved with the Joshua Knoll housing development and not the Lafayette Estates development which is the subject of the present action. Therefore, I will not address this representation of Blue Grass Construction Co. as a prior representation which might warrant disqualification.

3. The motion to disqualify stated that Mr. Cohen had represented Mr. Nalibotsky in 1977 and 1978. The response to the motion did not refer to the 1978 representation. Mr. Cohen testified that he did not recall this 1978 representation at the time of the intra-firm conflict-of-interest check in 1981 but did remember it when he saw the reply brief filed on the present motion.

A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of the client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent the misuse of such information by his employees and associates. Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.

Also, Ethical Consideration 4–6 reads, in pertinent part:

The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of his employment.

Defendants contend that, under the circumstances, Mr. Cohen could not now represent INAU in the present action due to his prior representation of currently adverse parties, Mr. Nalibotsky and his related corporations. And since, as defendants further contend, because the disqualification of one member of a firm mandates the disqualification of all members of the firm, Mr. Boote cannot continue to represent INAU in the action against Mr. Nalibotsky. D.R. 5–105(D).

### (1) *Laches*

As a preliminary matter, plaintiff argues that the motion to disqualify should be denied pursuant to the equitable doctrine of laches. In support of this position, plaintiff suggests that Mr. Nalibotsky has been or should have been aware of Wolf, Block's involvement in this litigation ever since the commencement of this action in 1981 and most assuredly became aware of it during the course of recent settlement negotiations involving plaintiff and Mr. Nalibotsky.

■ It is generally established that laches is not a bar to a motion to disqualify since a court's supervision of the ethical conduct of attorneys practicing before it is designed to protect the public interest and not merely the interest of the particular moving party. *E.g., Emle Industries, Inc. v. Glen Raven Mills, Inc.,* 478 F.2d 562, 574 (2d Cir.1973); *Government of India v. Cook Industries, Inc.,* 422 F.Supp. 1057 (S.D.N.Y.1976); *Koehring Company v. Manitowoc Company,* 418 F.Supp. 1133 (E.D.Wis.1976); *Empire Linotype School, Inc. v. United States,* 143 F.Supp. 627 (S.D.N.Y.1956). However, some courts have found delay in the filing of a motion to disqualify to be relevant to the resolution of such a motion. In particular, delay may bar the presentation of a motion to disqualify if that delay reflects an attempt by the moving party to use the disqualification issue merely to gain a tactical advantage. *E.g., Arkansas v. Dean Food Products Company,* 605 F.2d 380 (8th Cir.1979); *Redd v. Shell Oil Company,* 518 F.2d 311 (10th Cir.1975); *United States v. Newman,* 534 F.Supp. 1113 (S.D.N.Y.1982). In addition, it has been suggested that potential prejudice to other parties to the litigation, particularly the party whose counsel may be disqualified, may be considered in the disqualification analysis. *E.g., Arkansas v. Dean Foods Products Company,* 605 F.2d 380 (8th Cir.1979); *Kramer v. Scientific Control Corporation,* 534 F.2d 1085 (3d Cir.1976).

In the present case, plaintiff has suggested in its response to the motion to disqualify that this motion was presented merely to avoid certain discovery which was scheduled to occur in the near future—specifically, the deposition of Mr. Nalibotsky by plaintiff's counsel. Plaintiff has also suggested that the fact that the motion was not made until settlement negotiations between plaintiff and Mr. Nalibotsky had broken down casts doubt upon defendants' good faith in filing this motion.

■ At the hearing on the motion Mr. Nalibotsky testified that he had been aware of Wolf, Block's involvement in the current litigation for some time prior to this year. The reason given for the failure to raise the possible conflict of interest at

the beginning of this litigation is that Mr. Nalibotsky, who has suffered from very serious coronary disease for the past four years, did not recollect his prior employment of Wolf, Block or connect that to the current dispute until after he was deposed in late May of this year. It does seem surprising that it took Mr. Nalibotsky over two and one-half years to become concernedly cognizant that he had previously retained the firm which he knew was representing plaintiff in this action. Nevertheless, I have no ground for concluding that Mr. Nalibotsky's testimony was false. Accordingly, I cannot conclude that the motion to disqualify was merely filed for tactical purposes.

■ Plaintiff also asserts that a change of counsel at this late date would cause it severe prejudice and substantially delay the likely trial date of this action. Obviously, a change in counsel after almost three years of proceedings in a case in which the official files alone contain over four hundred and fifty documents would impose on plaintiff a substantial added burden for attorney's fees, since new counsel would have to devote much time to becoming familiar with matters that current counsel have long since mastered. Such a change of counsel would also require suspension of pretrial activities until plaintiff's new counsel could competently represent his client's interests. However, the expense and inconvenience are not so substantial as to outweigh the public interest in assuring that members of the bar live up to their professional ethical obligations. *Emle Industries, supra,* 487 F.2d at 574. Accordingly, were I to conclude that Wolf, Block's current representation of INAU against Mr. Nalibotsky contravenes the ethical standards which must be observed by practitioners in this court, I would have to direct Wolf, Block to withdraw from this litigation. On the other hand, when a substantial amount of time and effort have already been expended by the counsel who may be disqualified and disqualification would impose a concomitant burden on the current client, it is particularly important for the court carefully to sift through the facts and law surrounding the motion to disqualify to assure that any determination that disqualification is warranted is a correct one.

**(2)** *Waiver*

Plaintiff also suggests that Mr. Nalibotsky's delay in asserting the disqualification issue supports a finding that the objection has been waived. A number of courts have found waiver to be a valid basis for denial of a motion to disqualify. *E.g., Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85 (9th Cir.1983); *Arkansas v. Dean Food Products Company,* 605 F.2d 380 (8th Cir.1979); *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.,* 573 F.2d 988 (8th Cir.1978); *In Re Yarn Processing Patent Validity Litigation,* 530 F.2d 83 (5th Cir.1976); *United States v. Newman,* 534 F.Supp. 1113 (S.D. N.Y.1982).

■ Such a finding is justified either when a former client expressly agrees to the attorney's representation of an adversary—a scenario not contended for here—or when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity. In the latter circumstance, the person whose confidences and secrets are potentially at risk of disclosure or misuse is held to have waived his right to protection from that risk.

■ However, the record does not support a finding of waiver by Mr. Nalibotsky. As noted above, I am not persuaded that Mr. Nalibotsky lied in testifying that, prior to this Spring, he did not recall that the labor lawyer he retained in 1976 and 1978 was connected with Wolf, Block. Accordingly, I cannot conclude that Mr. Nalibotsky *knowingly* failed to raise the objection. This is not, therefore, an appropriate case for a finding of waiver; the motion to disqualify must be evaluated on its merits.

**(3)** *"Substantial Relationship"*

In *American Roller Co. v. Budinger,* 513 F.2d 982 (3d Cir.1975), the Court of

Appeals for the Third Circuit, speaking through then Chief Judge Seitz, established the analytical framework for consideration of motions to disqualify based upon prior representation of an adverse party:

> Canon 4 of the Code of Professional Responsibility imposes upon an attorney an obligation to preserve the confidences and secrets of one who had employed him and extends this obligation beyond termination of the employment. Indeed, an attorney is prohibited from accepting a subsequent representation where there "may be the appearance of a possible violation of confidences" even though this may not be true in fact. ABA Committee on Professional Ethics, Informal Opinion No. 885 (1965). Courts have enforced these precepts by requiring disqualification of counsel where it appears that the subject matter of the pending suit in which the attorney represents an interest adverse to a prior employer is such that during the course of the former representation the attorney "might have acquired substantially related material." *Richardson v. Hamilton Int'l Corp., supra,* 469 F.2d [1382] at 1385 [3d Cir.1972]; *T.C. Theatres Corp. v. Warner Bros. Pictures Inc.,* 113 F.Supp. 265 (S.D.N.Y.1953).

*Id.* at 984.

■ In order to perform this analysis, it is not necessary, nor is it appropriate, for the court to inquire into the actual confidences or secrets which may have been disclosed during the prior representation and to evaluate their relationship to the current litigation. Such an investigation would substantially undermine the protections for confidences and secrets found in Canon 4 of the Code of Professional Responsibility.[4] As noted by the Court of Appeals for the Seventh Circuit, the "substantial relationship" test:

> does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed.

The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation.... The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information. Then only where it is clearly discernible, "that the issues involved in a current case do not relate to matters in which the attorney ... represent(s) the (sister corporation) will the attorney's present representation be treated as measuring up to the standard of legal ethics."

---

**4.** In the order scheduling the evidentiary hearing on this motion, I noted that, in my judgment, it was inappropriate to inquire into the actual confidences which may have been disclosed during the prior representation but that the parties should focus their evidentiary presentations on the scope of the prior representation. However, quite early in the course of the hearing it became apparent that the parties desired to present a far broader range of evidence. Thus, after a conference with counsel at which all agreed that the scope of the hearing should be expanded beyond the limits established by my order, I allowed the parties to inquire into actual attorney/client communications.

Despite this stipulated expansion of the scope of the hearing in this case, I retain the belief that it is not appropriate for the court to look for actual disclosure of confidences in the prior representation to determine whether disqualification is warranted. The question which I must address is whether the nature and scope of the prior representation were such that confidences *might* have been disclosed during that representation which would be relevant to the present action. Thus, I have relied upon the evidence presented in the form of affidavits and at the hearing primarily to determine the scope of the prior representation. However, to the extent that the testimony described actual confidences disclosed during the prior representations at issue in this case, I conclude that no actual confidences were disclosed which warrant the disqualification of Wolf, Block.

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (1978) (footnote and citation omitted). *E.g., Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 270 (D.Del.1980).

What is required is an evaluation of the substance of the prior representation as compared with the substance of the present adverse representation. The fact that the prior and present representations do not involve similar causes of action does not, of itself, establish that the two representations are not substantially related. Conversely, the fact that the prior and current representations involve the same housing development does not, of itself, establish that they are substantially related. Although these facts may be relevant to the analysis, the court's primary concern is whether "confidential information that might have been gained in the first representation [may be] used to the detriment of the former client in the subsequent action." *Realco Services, Inc. v. Holt*, 479 F.Supp. 867, 871 (E.D.Pa.1979).

■■■ Thus, a court addressing the "substantial relationship" issue must answer the following questions:

1. What is the nature and scope of the prior representation at issue?

2. What is the nature of the present lawsuit against the former client?

3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation? [5]

■■■ In answering the first question, the court should consider both the purposes for which the attorney was employed and the facts underlying the matter for which the attorney was responsible. However, the focus should be upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform. Once the purposes for which the. attorney was employed are clear, it is then possible to consider the type of information which a client would impart to an attorney performing such services for him.

■■■ The second question is relatively simple to answer. All that is necessary is an evaluation of the issues raised in the present litigation and the general facts upon which the legal claims asserted in the present action are based.

■■■ In resolving the third question— whether confidential information "might" have been received in the course of the prior representation which would be substantially related to the present representation—the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information "might" have been disclosed which would be relevant to the present suit. "The lawyer 'might have acquired' the [substantially related] information in issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship." *Realco Services, Inc., supra*, 479 F.Supp. at 871–72.[6]

5. In their closing statements following the evidentiary hearing, counsel for defendants argued that the proper test was whether the matters involved in the prior representation bore a causal relationship to the issues in the present litigation. Although the factual relationship between the issues underlying each representation is relevant to the "substantial relationship" analysis, the fact that the two representations involved similar facts or related facts is not, itself, sufficient to warrant a finding of "substantial relationship." The reason for disqualification of counsel who have formerly represented a cur-

rent adversary is to protect from potential disclosure of confidences acquired during the prior representation. Thus, the court must focus upon whether confidences might have come out during the prior representation which would be relevant to the current action and not merely consider the relationship between the facts underlying the two representations.

6. Of course, in the present case during the evidentiary hearing there was some discussion of actual attorney/client communications during the prior representation. *See* footnote 4. To

■ The mere disclosure of confidential information to counsel in the course of the prior representation is not, itself, sufficient grounds for disqualification of that counsel when he later represents an adverse party. The confidential information must be of the type which one would expect to be related to the issues in the present litigation.

■ The burden of establishing this "substantial relationship" falls upon the moving party. *E.g., National Souvenir Center v. Historic Figures, Inc.,* 728 F.2d 503, 517–18 (D.C.Cir.1984); *Duncan v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir.1981); *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978); *Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1385 (3d Cir.1972); *Stanwood Corp. v. Barnum,* 575 F.Supp. 1250, 1251 (W.D.N.C.1983); *City Consumer Services, Inc. v. Horne,* 571 F.Supp. 965, 970 (C.D.Utah 1983); *Brotherhood Railway Carmen of the United States and Canada v. Delpro Co.,* 549 F.Supp. 780, 782, 787 (D.Del.1982); *Zions First National Bank, N.A. v. United Health Clubs, Inc.,* 505 F.Supp. 138, 139–40 (E.D.Pa.1981). At the same time, any doubts which the court may have regarding the appropriateness of disqualification should be resolved in favor of disqualifying the former counsel and, thus, preserving the confidences of the former client. In the present case, defendant has failed to satisfy that burden.

(a) *The nature and scope of the prior representation*

The parties are in agreement that the two prior representations of Mr. Nalibotsky and his related corporate entities which are at issue on this motion both involved labor unrest at the Lafayette Estates housing development. The first occurred in 1976 when members of the Philadelphia Building Trades Council picketed the construction site to protest the use of nonunion laborers by certain subcontractors. Mr. Nalibotsky contacted Mr. Eitner, the Executive Director of the Home Builders' Association, to determine what he should do to stop the picketing and allow construction to continue at its normal pace. Mr. Eitner recommended that Mr. Nalibotsky retain Mr. Cohen who had represented the Home Builders' Association in the past.

This representation began either at the end of October or in early November, 1976. The first written evidence of the representation is found in a letter dated November 2, 1976 from Mr. Nalibotsky to Mr. Cohen. Mr. Cohen represented Mr. Nalibotsky in negotiations with the Building Trades Council and assisted in the drafting of a final agreement between Mr. Nalibotsky and his related corporate entities and the Building Trades Council. The representation ended on approximately November 16 with the execution of the agreement.

The next representation of Mr. Nalibotsky by Mr. Cohen began in mid-May 1978. Mr. Nalibotsky was then concerned with threats of picketing at the construction site. During this representation Mr. Cohen, on Mr. Nalibotsky's behalf, filed with the NLRB two charges of unfair labor practices against the Building Trades Council. Mr. Cohen again met with representatives of the Building Trades Council and, as a result of these meetings, the parties resolved the dispute. This representation concluded with Mr. Cohen's withdrawal of the unfair labor practice charges in June.

Although these representations occurred at different points in the construction of the Lafayette Estates development, they involved very similar problems. In both cases the Building Trades Council was concerned about the failure of certain subcon-

the extent that this testimony suggests that confidences were disclosed during the prior representation which might not have been expected under this test, I have also considered those confidences in reaching the conclusion that no "substantial relationship" exists between the prior and current representation warranting disqualification. Also, to the extent that such disclosures might suggest that the scope of the prior representation was broader than the other evidence submitted on this motion might establish, I have considered them for that purpose as well.

tractors to hire union employees. As a result, picketing occurred at the worksite for approximately one week during the first representation and for about two days during the second representation. During both periods of picketing Mr. Nalibotsky was primarily concerned about (a) delays in construction likely to flow from the picketing, and (b) the possibility of violence at the construction site. He was also concerned that he not be required to alter his choice of subcontractors in the midst of the construction process.

The purpose of the employment of Mr. Cohen in 1976 and again in 1978 was clear from the testimony of Mr. Nalibotsky and Mr. Cohen. In both instances, Mr. Nalibotsky retained Mr. Cohen solely to stop the picketing and allow his construction work to continue at its usual pace. For example, during his direct examination, Mr. Nalibotsky testified as follows:

When I called Dan [Mr. Cohen], and I finally spoke to Dan, I told him about the picketing, I told him about the conversations that I had with Ralph Williams, and I said under no circumstances could I throw off my nonunion contractors and put union contractors on, that we had the job already sold out, under contract, working on a low profit margin, and we have to remove these pickets immediately because they are holding up the job, they are keeping the job from going forward.

Transcript of Hearing, August 20, 1984, Part II, at 16. During the examination of Mr. Nalibotsky by counsel for Mr. Kravitz, Mr. Nalibotsky was asked:

Q. Mr. Nalibotsky, it was necessary to retain the services of a competent labor attorney to help you control the costs of producing the product which you had premarketed. Am I right when I say that?

A. I hired the labor attorney to resolve the labor problems so that yes, we could get on with the job.

Transcript of Hearing, August 21, 1984, Part I at 62. Later, when he was asked about arrangements which he and Mr. Co-

hen had made with regard to payment for Mr. Cohen's services, Mr. Nalibotsky stated:

We didn't even discuss it, it was a matter of I guess good faith. We were concerned about getting the job moving again, so I don't ever remember discussing a specific fee or whatever. Whatever bill came in, we paid it.

*Id.* at 73.

Thus, Mr. Nalibotsky's principal concern in employing Mr. Cohen was to halt the picketing at his job site. To that end he sought out an attorney who specialized in labor practice to solve this specific problem.

This view of Mr. Cohen's limited and narrowly focused purpose during these representations is confirmed by Mr. Cohen's testimony. During his direct examination Mr. Cohen testified that:

A. Well, he didn't have to tell me that increased costs would affect his profit. That is quite obvious. But costs and profit as such were not before us. Our job was to get rid of the pickets and get the building process moving.

Transcript of Hearing, August 21, 1984, Part II at 32. Later, during cross-examination, Mr. Cohen was reviewing his notes from the file on the May 1978 representation and noted that at the bottom of a page was written the following:

"What do I have to do to get the pickets to go away?"

*Id.* at 60. He then explained that the reasons for that question in his notes were twofold:

At the bottom of the page, "What do I have to do to get the pickets to go away" is first of all what we were all about, and secondly, that is a question that I urged anyone on the site to pose to a responsible picket or picket captain or business agent, because his answer will most likely be hire union people which is an unfair labor practice.

*Id.* at 61.

Mr. Cohen was not hired to provide general legal advice with regard to Mr. Nali-

botsky's construction work. Mr. Nalibotsky testified that he employed a number of different attorneys at different times in the course of his business career and, at the time Mr. Cohen was retained to assist in halting the picketing, Mr. Nalibotsky also employed other attorneys including Ben Zuckerman, Esq. Transcript of Hearing, August 21, 1984, Part I at 13.

The limited nature of Mr. Cohen's responsibilities is also evident from Mr. Cohen's testimony. In response to a question regarding the nature of his discussions with Mr. Nalibotsky, Mr. Cohen stated:

> He was in the business of selling homes, but I certainly had nothing to do with that aspect of his business.

Transcript of Hearing, August 21, 1984, Part II at 32.

Consequently, on the basis of all the evidence which has been presented to me, I conclude that Mr. Cohen's work for Mr. Nalibotsky both in 1976 and 1978 was for the sole purpose of finding a way to remove the pickets from the Lafayette Estates construction site. Mr. Cohen worked on each of these matters for only a relatively short period of time and was not generally responsible for Mr. Nalibotsky's legal matters during either of these time periods.

(b) *The nature of the present case*

The crux of the complaint in this action is stated in paragraph 31 of the complaint filed by INAU.

31. During the course of construction, the Builder Defendants employed improper and defective materials and construction techniques in construction of the homes in order to produce homes which appeared superficially sound and properly constructed, but which cost the Builder Defendants substantially less to construct than homes which incorporated proper materials and construction techniques.

These allegations have been multiplied and asserted against numerous subcontractors in the form of third-party claims. The ultimate issues for resolution in this action will be what, if any, defects existed in the homes in Lafayette Estates and who, if anyone, is responsible for the defects discovered in the homes after they were occupied.

The types of defects in question in this action cover a wide range. They include problems with the hearing and air conditioning systems, carpentry, plumbing, and numerous other features of these homes.

However, it is important to note that none of the pleadings filed in this action has mentioned labor unrest as a cause of or defense to the claims asserted. Furthermore, during a three-day deposition of Mr. Nalibotsky at the end of May of this year the subject of labor unrest never arose. In fact, it is apparent from Mr. Nalibotsky's failure to recall for over two-and-a-half-years that he was formerly represented by an attorney at Wolf, Block with regard to labor problems at the Lafayette Estates construction site that those issues are unrelated to the issues in the present suit.

(c) *Whether confidences might have been disclosed in the course of the prior representation which would be relevant in the present action*

In light of the obviously narrow scope of the prior representations of Mr. Nalibotsky and his related corporations by Mr. Cohen and his firm and the apparent lack of relationship between the allegations in the present action and the events leading to the prior representations, it is evident that any confidences which may have been disclosed to Mr. Cohen during the course of the prior representations are not likely to be relevant to the present action. The nature and scope of the prior representations of Mr. Nalibotsky and his corporations by Wolf, Block were clearly limited and focused solely upon the negotiation of an end to the picketing.

Mr. Cohen was provided with the basic information necessary to halt the picketing. Armed with his own common sense and experience with labor unrest, he was of course aware that there were financial con-

straints upon Mr. Nalibotsky and that some disruption of the progress of the construction was likely to result from the picketing. However, Mr. Cohen was not hired as a general counsel. He was informed of his limited duties and worked with Mr. Nalibotsky to achieve the narrow ends for which he was employed. Thus, although much time was spent at the evidentiary hearing in testimony about such matters as the margin of profit on the townhouses being built at the Lafayette Estates development, threats of harm to nonunion personnel and Mr. Nalibotsky's concern that those working under stress might not maintain the requisite level of concentration, there is no reason to expect that confidential details about these concerns were transmitted to the attorney hired solely to stop the picketing. ·

**7.** As noted earlier, *see* footnote 6, *supra,* those attorney/client discussions which were disclosed during the course of the hearing on this motion have been considered to the extent that they indicate that more confidential information was in fact disclosed than one might, *a priori,* have expected. However, the testimony regarding actual attorney/client communications showed either that confidential details regarding Mr. Nalibotsky's general concerns were not disclosed to Mr. Cohen or that, to the extent that details were disclosed, the information conveyed was not in any significant sense pertinent to the issues in the present action.

**8.** In its response to the motion to disqualify, plaintiff suggested that, should a "substantial relationship" be found, the court should consider whether (a) the lack of communication between Mr. Cohen and Mr. Boote to date regarding the prior representation, combined with (b) a formal screening mechanism—or "Chinese Wall"—which would hereafter preclude disclosure of information from the prior representation to Mr. Boote, could be used to avoid disqualification. *See e.g.,* "Developments in the Law—Conflicts in the Legal Profession," 94 *Harv.L.Rev.* 1244 (1981); Note, "The Chinese Wall Defense to Law Firm Disqualification," 128 *U.Penn.L.Rev.* 677 (1980).

The decision that use of such a "Chinese Wall" or screening procedure can avoid disqualification would run contrary to the general principle established by D.R. 5–105(D):

If a lawyer is required to decline employment or to withdraw from employment under a

Furthermore, to the extent that business information about the Lafayette Estates development may have been disclosed to Mr. Cohen, I conclude that such information is quite unlikely to be at all pertinent to the present action. I find that the chances for any confidences previously disclosed to Mr. Cohen to be in any way detrimental to Mr. Nalibotsky's interests in the present litigation are virtually nonexistent.[7]

 Consequently, upon a full review of the factual record developed on this motion, I conclude that there is not a "substantial relationship" between the prior representation and the present litigation warranting disqualification pursuant to *American Roller v. Budinger.*[8] In sum, I

Disciplinary Rule, no partner, associate, or any other lawyer affiliated with him or his firm may accept or continue such employment.

"Chinese Walls" have been used to avoid disqualification in relatively few cases. They are most commonly accepted by the courts when an attorney has moved from government to private practice and is now a member of a private firm which represents clients who are current adversaries of the government agency at which that attorney was formerly employed. Disqualification has been avoided in some of these cases when the "Chinese Wall" was established prior to the arrival of the new attorney at the firm and when the "Chinese Wall" in question is a formal, written screening procedure. *E.g., Sierra Vista Hospital, Inc. v. U.S.,* 639 F.2d 749 (Ct.Cl.1981); *Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir.1980) (en banc); *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.,* 573 F.2d 988 (8th Cir.1978); *Kesselhaut v. U.S.,* 555 F.2d 791 (Ct.Cl.1977); *Kadish v. Commodity Futures Trading Commission,* 553 F.Supp. 660 (N.D.Ill.1982) and 548 F.Supp. 1030 (1982). *Cf. United States v. Miller,* 624 F.2d 1198 (3d Cir. 1980) (a "Chinese Wall" may be used to avoid disqualification in an appropriate case but it was not raised by the parties here). *But see e.g., Paul E. Iacono Structural Engineer, Inc. v. Humphrey,* 722 F.2d 435 (9th Cir.1983); *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983); *Arkansas v. Dean Food Products Co.,* 605 F.2d 380 (8th Cir.1979); *Illinois v. Borg, Inc.,* 553 F.Supp. 178 (N.D.Ill.1982); *U.S. v. Uzzi,* 549 F.Supp. 979 (S.D.N.Y.1982); *In re Asbestos Cases,* 514 F.Supp. 914 (E.D.Va.1981). Those courts which have accepted the use of a "Chi-

find no grounds for holding that Wolf, Block's current representation of Mr. Nalibotsky's adversary violates the rules of professional ethics adopted by this court.[9]

Accordingly, the motion to disqualify will be denied.

An appropriate Order will follow.

---

nese Wall" in such circumstances have focused on the public interest in encouraging young attorneys to devote a few years of their careers to government service rather than moving directly into a more lucrative private practice. A *per se* rule of disqualification of a former government attorney's new firm from all cases against his former employer, or even from all cases in which he had some role, substantially reduces opportunities for former government attorneys in the private sector. As a result, young lawyers might be deterred from accepting positions in government service at early stages of their careers.

It is much rarer for a court to rely upon the establishment of a "Chinese Wall" to avoid the need for disqualification when an attorney moves between private law firms and, in the process, moves from a firm which represented an adversary of a client of the attorney's new firm. A screening mechanism was used to avoid disqualification under such circumstances in *Novo Terapeutisk Laboratorium a/s v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186 (7th Cir.1979) (en banc); *LeMaire v. Texaco, Inc.*, 496 F.Supp. 1308 (E.D.Tex.1980). But the majority of courts which have addressed the issue in this factual context have ordered disqualification despite screening efforts. *E.g., Schiessle v. Stephens*, 717 F.2d 417 (7th Cir.1983); *Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir.1980); *Amoco Chemicals Corp. v. D.C. MacArthur*, 568 F.Supp. 42 (N.D.Ga.1983); *Yaretsky v. Blum*, 525 F.Supp. 24 (S.D.N.Y.1981).

When members of a single firm represent opposing parties at different times, "Chinese Walls" have, as a general matter, not been sufficient to avoid disqualification. *E.g., Analytical Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir.1983); *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341 (5th Cir.1981); *Trone v. Smith*, 621 F.2d 994 (9th Cir.1980); *MPL, Inc. v. Cook*, 498 F.Supp. 148 (N.D.Ill.1980). *See also Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.1978) (concurrent representation of adversaries by the same firm); *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225 (2d Cir.1977) (concurrent representation of adversaries by the same firm).

Plaintiff suggests that the opinions in *Hughes v. Paine, Webber, Jackson & Curtis, Inc.*, 565

F.Supp. 663 (N.D.Ill.1983) and *INA Underwriters Ins. Co. v. Rubin*, No. 82–1989 (E.D.Pa. February 10, 1983) recognize that a "Chinese Wall" may be used to avoid disqualification when the prior and former representations are by members of the same firm. Those cases are, however, to some extent, distinguishable from the usual situation in which the same firm represents adversaries at different times since the alleged "prior representation" at issue in those actions was no more than a consultation with the current adversary who was then considering employing that firm to perform certain legal work for him. Thus, the former "client" had never actually retained the firm in question to perform legal services for him. Although any confidential communications which may have occurred between the putative "client" and a member of the firm would still be protected from disclosure by Canon 4, in this situation, it is likely that substantial confidences would routinely be disclosed given the limited nature of discussions between a potential client and an attorney. Also, since most attorneys do not check for conflicts within the firm until after they have met with the potential client and determined whether to represent that individual and the nature of the likely representation, there is little the attorney could have done in these situations to avoid the ethical dilemma which now confronts his firm.

Due to my resolution of the "substantial relationship" issue, the interesting question whether a "Chinese Wall," if properly and timely erected, could be used to avoid disqualification when the prior representation is very limited and far removed in time from the current representation need not be addressed.

---

9. Although the question was not directly raised in the motion, I have also considered whether disqualification is warranted in the present case due to any "appearance of impropriety" resulting from the current representation of the prior client. Canon 9. *See e.g., IBM v. Levin*, 579 F.2d 271 (3d Cir.1978). Under the facts and circumstances surrounding the present motion, I can find no aspect of the conduct of any of the attorneys in question which creates an appearance of impropriety warranting disqualification.