*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JANIQUA MORGAN as Next Friend of TM, a
Minor,

Plaintiff-Appellant,

v

FORD MOTOR COMPANY and ADIENT US,
LLC,

Defendants-Appellees,

and

LEAR CORPORATION, BROSE NORTH
AMERICA INC., and MAGNA INTERNATIONAL
OF AMERICA INC.,

Defendants.

UNPUBLISHED
August 17, 2023

No. 362260
Macomb Circuit Court
LC No. 2021-004257-NP

Before: REDFORD, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

In this product liability action, plaintiff Janiqua Morgan, as next friend of her son, TM, appeals by leave granted[1] the order granting defendant Ford Motor Company's motion to disqualify plaintiff's attorney, Donald H. Dawson, Jr. We vacate the trial court's order and remand for an evidentiary hearing.

## I. BACKGROUND

In June 2021, 12-year-old TM was seated in the drivers-side back passenger seat of a 2014 Fusion sedan manufactured by Ford. As the driver of the Fusion turned onto Eastbound Metro

---

[1] *TM v Ford Motor Co*, unpublished order of the Court of Appeals, entered August 17, 2022 (Docket No. 362260).

Parkway, the Fusion was struck in the rear by an oncoming vehicle, causing the driver's seat to collapse backward into TM. TM suffered severe injuries, including facial and skull fractures, as well as a traumatic brain injury.

The Fusion's driver seat belonged to a seat design family developed by Ford called Gen-2 seats. It was comprised of a set of structural components, including the seat back frame, seat cushion frame, recliner mechanism and head restraint. The Gen-2 seat design was developed between 2009 and 2012. It was implemented as a brand-new seat design in the 2013 to 2020 models of the Ford Fusion. Gen-2 seats differ from the seats used in 2006 to 2012 Fusion model, in that they do not carry over any design elements from the seat designs that were implemented in those earlier models. However, although the Gen-2 seat design was entirely new, it was subject to similar tests as other Ford seat designs, including a test called the ST-0801, which Ford began implementing in 2008.

In 2021, plaintiff, on behalf of TM, brought the instant lawsuit against Ford and several other defendants, including Lear Corporation, Brose North America, Inc., Adient US, LLC, and Magna International of America, Inc. Relevant to this appeal, plaintiff made the following claims against Ford: (1) negligent production of the Fusion; (2) breach of implied warranty; (3) gross negligence; (4) breach of express warranty; and (5) failure to warn. Ford answered the complaint and generally denied liability.

Attorney Dawson filed an appearance in the trial court on behalf of plaintiff. Dawson previously represented Ford "for nearly 25 years in dozens of product liability cases," "served as national counsel to Ford in seat litigation[.]" He "defended Ford in cases involving allegations and claims by plaintiffs that their vehicles' seat backs were defective causing injury." Dawson last represented Ford in a seat back litigation case in 2009, and ultimately ended his representation of Ford in 2014.

Ford moved to disqualify Dawson from representing plaintiff under Michigan Rule of Professional Conduct (MRPC) 1.9. Ford submitted that Dawson should be disqualified because: (1) he previously represented Ford in other seat back litigation cases; (2) he was advocating for interests materially adverse to Ford by pursuing plaintiff's claims against Ford; (3) plaintiff's case was substantially related to Dawson's prior representation of Ford; and (4) Ford would suffer substantial prejudice, given that Dawson received confidential and privileged information from his work with Ford, including litigation strategies.

Plaintiff responded, arguing that Dawson's prior representation of Ford was not substantially related to his representation of plaintiff. Therefore, said plaintiff, Dawson should not be disqualified under MRPC 1.9. Plaintiff claimed Dawson's prior representation of Ford was not substantially related because Ford had not demonstrated that Dawson had ever worked on a seat back case involving a rear seated child, as was the case here. Moreover, said plaintiff, there was no overlap in the subject matter between the cases Dawson litigated for Ford and the present case. Plaintiff pointed out that Dawson had not litigated any matters related to the Gen-2 seat design on Ford's behalf, and argued that he therefore had obtained no relevant, confidential information that would be prejudicial to Ford. Plaintiff also noted that according to Roger Burnett, an automotive engineer and technical leader at Ford, the Gen-2 seat design "did not rely upon any 'carryover testing' during the design phase."

Ford replied, arguing that disqualification was proper because plaintiff sought information gathered during Dawson's employment with Ford. Ford further argued that Dawson was privy to confidential information regarding Ford's research, testing, design philosophy, and defense strategies for cases related to the Gen-2 seats. Further, because Dawson was a principal lawyer representing Ford in seat back litigation, he was presumed to have confidential information detrimental to Ford.

Without holding a hearing, the trial court found that Dawson's prior representation was substantially related to plaintiff's case. It explained, in relevant part:

> Significantly, design of the Gen 2 seat would have derived from and relied on defendant Ford's prior seat designs, which Dawson did provide defenses against negligence claims for defendant Ford. Indeed, Dawson's counsel acknowledges Dawson previously "presented evidence . . . similar to what is at issue in the Morgan matter[,]" [and] "evidence involv[ing] issues concerning seat backs that were utilized in Ford products[.]" Dawson has not established all of the information to which he would have been exposed during his prior representations of defendant Ford would have been admitted into evidence in prior cases; to the contrary, information produced during discovery would surely have been subject to protective orders.

> Therefore, Dawson clearly represented defendant Ford in matters substantially related to plaintiff's claims. Accordingly, Dawson is disqualified from further representation of plaintiff.

Accordingly, the trial court granted Ford's motion to disqualify Dawson. This appeal followed.

## II. ANALYSIS

Plaintiff argues that the trial court improperly granted Ford's motion to disqualify Dawson because the trial court incorrectly found that his prior representation of Ford was substantially related to plaintiff's case, based on Dawson's litigation of other seat back cases on behalf of Ford. We generally disagree, but note that further factual development is required to determine whether plaintiff obtained specific knowledge about Ford's defense strategies that would be prejudicial to Ford in the instant matter.

"A party seeking the disqualification of counsel bears the burden of demonstrating *specifically* how and as to what issues in the case the likelihood of prejudice will result." *Killingbeck v Killingbeck*, 269 Mich App 132, 148; 711 NW2d 759 (2005) (citation omitted) (emphasis added).

> The determination of the existence of a conflict of interest that disqualifies counsel is a factual question that we review for clear error. A trial court's findings of fact are clearly erroneous only if we are left with a definite and firm conviction that a mistake was made. But we review de novo the application of "ethical norms" to a decision whether to disqualify counsel. [*Avink v SMG*, 282 Mich App 110, 116; 761 NW2d 826 (2009) (citations omitted).]

-3-

The rules of statutory construction apply to the interpretation of rules under the MRPC. *Morris & Doherty, PC v Lockwood*, 259 Mich App 38, 44; 672 NW2d 884 (2003) (citations omitted). Accordingly, "[i]f the plain and ordinary meaning of the language is clear, judicial construction is normally neither necessary nor permitted." *Id*. at 43 (citation omitted).

MRPC 1.9 addresses conflicts of interest that arise when an attorney's representation of one client is adverse to another client or former client. It states, in relevant part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
>
> * * *
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

Thus, "[t]he attorney breaches his or her fiduciary duty to a former client only by undertaking representation of a client who has interests both adverse and substantially related to work the attorney performed for the former client." *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 604; 792 NW2d 344 (2010). The comment to MRPC 1.9 states, in relevant part:

> The scope of a "matter" for purposes of this rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. *On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client* . . . . The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question. [Emphasis added.]

This Court has adopted a three-prong test to determine whether an attorney's representation of an adverse party is substantially related to the previous representation of a former client. *Alpha Capital Mgt*, 287 Mich App at 605 (2010). The test was first set forth in *INA Underwriters Ins Co v Nalibotsky*, 594 F Supp 1199, 1207 (ED Pa 1984). Under the test, a court must determine: (1) the nature and scope of the prior representation; (2) the nature of the present lawsuit against the

former client; and (3) in the course of the prior representation, whether the client might have disclosed to his attorney confidences which could be relevant to the present action and could be detrimental to the former client. *Alpha Capital Mgt*, 287 Mich App at 605, citing *INA Underwriters*, 594 F Supp at 1207. Specifically,

> [i]n answering the first question, the court should consider both the purposes for which the attorney was employed and the facts underlying the matter for which the attorney was responsible. However, the focus should be upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform. Once the purposes for which the attorney was employed are clear, it is then possible to consider the type of information which a client would impart to an attorney performing such services for him.

> The second question is relatively simple to answer. All that is necessary is an evaluation of the issues raised in the present litigation and the general facts upon which the legal claims asserted in the present action are based.

> In resolving the third question—whether confidential information "might" have been received in the course of the prior representation which would be substantially related to the present representation—the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information "might" have been disclosed which would be relevant to the present suit. The lawyer might have acquired the [substantially related] information in issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship. [*Alpha Capital Mgt*, 287 Mich App at 605-606 (quotation marks and citations omitted; alteration in original).]

"[I]t is well established that there is a presumption that an attorney receives confidential communications in the course of his representation of a client." *In re Osborne*, 237 Mich App 597, 609; 603 NW2d 824 (1999) (citation omitted). However, "mere disclosure of confidential information to counsel in the course of the prior representation is not, itself, sufficient grounds for disqualification of that counsel when he later represents an adverse party." *INA Underwriters Ins Co*, 594 F Supp at 1207.

The record shows that the Fusion contained a Gen-2 seat design, which was developed between 2009 to 2012. Ford implemented the Gen-2 seat design for the first time in the 2013 to 2020 models of the Ford Fusion. The Gen-2 seats "are considered by Ford to be a seat design family but are not interchangeable across vehicle model lines," and are different from the seats in 2006 to 2012 Fusions, having no carryover from previous seat designs. Further, although the Gen-2 seats were an entirely new seat design, they were subject to similar tests as other Ford seat designs, including the ST-0801 standard, which Ford began implementing in 2008. Dawson represented Ford "for nearly 25 years in dozens of product liability cases," including "cases involving allegations and claims by plaintiffs that their vehicles' seat backs were defective causing injury." One Ford employee attested that Dawson had privileged and confidential communications

discussing "Ford's defense strategies in seat design related litigation, the review and analysis of Ford's confidential and proprietary documents, preparation and presentation of witnesses on behalf of Ford, and discussion of other confidential and privileged information." However, Dawson never litigated cases involving the Gen-2 seat design on behalf of Ford, nor did he have any confidential information regarding the Gen-2 seat design. Dawson last represented Ford in a seat back case in 2009, and ended his representation of the company entirely in 2014, seven years before plaintiff brought the instant lawsuit.

Applying this evidence to the first prong of the *Alpha Capital Mgt* test, there is no dispute that Dawson represented Ford for more than two decades, including in cases involving faulty car seats. Ford submits that these cases are similar to plaintiff's case because they all generally involve product liability claims alleging seat back failure that resulted in injury. The undisputed evidence shows that Dawson represented Ford in other product liability cases involving allegedly faulty car seats. Thus, we conclude that under the first prong of the *Alpha Capital Mgt* test, this case and Dawson's prior representation of Ford pertained to the same subject matter, namely, product liability cases involving car seats.

Under the second prong of *Alpha Capital Mgt* test, Ford generally asserts that there is "extensive overlap of factual and legal issues" between plaintiff's case and Dawson's litigation on behalf of Ford because they all involved seat back failures or defects and product liability laws. Although the Gen-2 seats were brand new for the 2013 model year Fusions, they still tended to have the same components as other Ford car seats. The same testing standards, including the ST-0801 standard, were used to test the Gen-2 seats and earlier seat designs. Additionally, Dawson specifically represented Ford in cases involving allegedly faulty seats in the past. For all of these reasons, it is clear that there was significant overlap between the factual and legal issues in past seat back cases where Dawson represented Ford, and the current case where he intended to represent plaintiff.

However, we conclude that Ford has not met the third prong of the *Alpha Capital Mgt* test. Recall that when analyzing the third prong,

> the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information "might" have been disclosed which would be relevant to the present suit. The lawyer might have acquired the [substantially related] information in issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship [*Alpha Capital Mgt*, 287 Mich at 605-606 (quotation marks and citation omitted; alteration in original).]

It is undisputed that none of the cases that Dawson handled while representing Ford in the past involved the Gen-2 seat design, given that the Gen-2 seat design was implemented in Ford's vehicles after 2013, and Dawson last represented Ford in a seat back litigation case in 2009. Thus, based on the timing of Dawson's representation of Ford in seat back matters, it is unlikely that Dawson received confidential information about the Gen-2 seat design when he previously represented Ford. Indeed, it would have been unusual—if not impossible—for Ford to discuss

Gen-2 seat design with Dawson during their relationship. See *Alpha Capital Mgt, Inc*, 287 Mich App at 606 (quotation marks and citations omitted).

However, although Dawson may not have had specific access to information regarding the Gen-2 seat design that would be prejudicial to Ford in the present matter, a question remains as to whether Dawson had access to *other* privileged and confidential communications that might prove prejudicial to Ford. Such confidential materials could include information regarding Ford's overall defense strategies, confidential or proprietary documents, or other privileged information substantially related to the product liability issue presented in the current case. Quoting *Osborne*, 237 Mich App at 609, Ford broadly states that we must presume that Dawson received substantially related, confidential information over the course of his years representing Ford. However, Ford does not specify exactly how that information substantially relates to the instant lawsuit, and instead appears to expect us to accept, on faith alone, that Dawson received such information.

More concerningly, the trial court found that the third prong weighed in favor of disqualifying Dawson without first determining what sort of confidential materials may have been transmitted, and how the information would have substantially related to the products liability issues presented here. Instead, without holding a hearing of any kind on the matter, the trial court merely concluded that

> design of the Gen 2 seat would have derived from and relied on defendant Ford's prior seat designs, which Dawson did provide defenses against negligence claims for defendant Ford. Indeed, Dawson's counsel acknowledges Dawson previously "presented evidence . . . similar to what is at issue in the Morgan matter[,]" . . . .

> \* \* \*

> Therefore, Dawson clearly represented defendant Ford in matters substantially related to plaintiff's claims. Accordingly, Dawson is disqualified from further representation of plaintiff.

Without further analysis, the presumption that Dawson received confidential information that would be *substantially* related to the instant matter is just that—a presumption, with little more than hypothesis to support it.

The trial court concluded that said materials were "substantially related" to the matter at hand without first determining—with at least some specificity—the type of confidential information that might have been conveyed in the years that Dawson served as counsel to Ford. Consequently, rather than affirming or denying on this basis, we conclude that the trial court should hold a hearing on remand to determine whether Dawson did in fact obtain substantially relevant information, per the third prong of *Alpha Capital Mgt*.

## III. CONCLUSION

Because the trial court failed to determine whether Dawson received relevant, confidential, and prejudicial information in accordance with the third prong of the *Alpha Capital Mgt* test, we conclude that the trial court erred in granting defendant's motion to disqualify Dawson. We thus

vacate the order granting Ford's motion to disqualify Dawson.  On remand, the trial court shall conduct a hearing to determine whether Dawson obtained confidential materials substantially similar to the case at hand that would be prejudicial to Ford under the third prong of the aforementioned test.

Vacated and remanded to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick