ALPHA CAPITAL MANAGEMENT, INC v RENTENBACH

Docket No. 287280. Submitted December 7, 2009, at Detroit. Decided
March 23, 2010, at 9:05 a.m.

Alpha Capital Management, Inc., brought an action in the Wayne
Circuit Court, John H. Gillis, Jr., J., against attorney Paul R.
Rentenbach and his law firm, Dykema Gossett, P.L.L.C., and another
of the firm's attorneys, alleging beach of fiduciary duties, tortious
interference with contractual relations and with prospective eco-
nomic and business advantages, and aiding and abetting Robert
Warfield in violating his contractual covenant not to complete with
Alpha Capital. The trial court denied a motion for summary disposi-
tion by Dykema Gossett and Rentenbach (hereafter defendants). The
Court of Appeals denied defendants' application for leave to appeal in
an unpublished order, entered October 27, 2006 (Docket No. 272819).
The Supreme Court also denied leave to appeal. 477 Mich 1059
(2007). Following a trial, the jury returned a verdict finding that
defendants had not breached a fiduciary duty to Alpha Capital,
former employees of Alpha Capital tortiously interfered with con-
tracts or business relations of Alpha Capital, defendants did not aid or
abet the tortious interference, and Warfield did not breach the
covenant not to compete. The trial court entered a judgment of no
cause of action. Alpha Capital appealed.

The Court of Appeals *held*:

1. An attorney's duties of loyalty and confidentiality continue
even after an attorney-client relationship concludes. However, the
continuing duties of loyalty and confidentiality apply only to
matters in which the new client's interests qualify as both adverse
to those of the former client and substantially related to the
subjects of the attorney's former representation.

2. A three-part test for examining the circumstances under which
an adverse subsequent representation may be deemed substantially
related to the legal services done for a former client asks: What is the
nature and scope of the prior representation at issue? What is the
nature of the present lawsuit against the former client? And, in the
course of the prior representation, might the client have disclosed to
his attorney confidences that could be relevant to the present action,
and in particular, could any such confidences be detrimental to the

former client in the current litigation? Application of this test in this case yields a conclusion that material questions of fact precluded summary determination whether defendants breached their fiduciary duties to Alpha Capital.

3. The trial court properly denied Alpha Capital's motions for partial summary disposition, a directed verdict, and judgment notwithstanding the verdict because the expert testimony diverged with respect to whether defendants' representation of Alpha Capital had a substantial relationship to the work they later performed for Alpha Partners, L.L.C., and its employees.

4. Application of the three-part test shows that substantial evidence supports the jury's conclusion that Alpha Capital failed to prove a breach of defendants' fiduciary duties. Defendants did not as a matter of law breach their fiduciary duties.

5. Because Alpha Capital indisputably breached its obligation under the stock purchase agreement with Warfield, the unambiguous terms of the agreement precluded Alpha Capital's enforcement of Warfield's covenant not to complete. Therefore, Rentenbach correctly informed Warfield that he could disregard the covenant not to compete. The trial court should have decided this issue in favor of Warfield as a matter of law.

6. The trial court did not abuse its discretion under the facts of this case by limiting the time allocated for the examination and cross-examination of certain witnesses. The trial court abused its discretion in refusing to permit Alpha Capital to make an offer of proof in accordance with MRE 103(a)(2). However, Alpha Capital later fully preserved its claim by filing a separate offer of proof, rendering harmless the trial court's ruling that did not allow the earlier offer of proof.

7. The trial court did not abuse its discretion by allowing defense counsel to refer to the settlement in a prior action by Alpha Capital against Warfield and others because Alpha Capital raised the issue first. Any error in this regard was harmless.

8. The trial court did not abuse its discretion by declining to remove a certain juror that Alpha Capital alleged was not impartial. Alpha Capital failed to substantiate its claim.

9. Although somewhat incomplete and imperfect, the trial court's jury instructions fairly and accurately presented the theories of the parties and the applicable law and did not substantially prejudice Alpha Capital's case. The trial court's refusal to give supplemental instructions requested by Alpha Capital did not prejudice Alpha Capital.

Affirmed.

1. ATTORNEY AND CLIENT — DUTIES OF LOYALTY AND CONFIDENTIALITY — FORMER CLIENTS.

An attorney's duties of loyalty and confidentiality continue even after an attorney-client relationship concludes; the continuing duties of loyalty and confidentiality apply only to matters in which a new client's interests qualify as both adverse to those of the former client and substantially related to the subjects of the attorney's former representation.

2. ATTORNEY AND CLIENT — DUTIES OF LOYALTY AND CONFIDENTIALITY — FORMER CLIENTS.

A three-part test may be employed to examine the circumstances under which a lawyer's subsequent representation of a client may be deemed substantially related to the legal services performed for a former client for purposes of determining a lawyer's continuing duties of loyalty and confidentiality to the former client: the test examines the nature and scope of the prior representation, the nature of the present lawsuit or representation, and whether, in the course of the prior representation, might the client have disclosed to the attorney confidences that could be detrimental to the former client in the current litigation.

3. JURY — JURY INSTRUCTIONS.

Jury instructions, even if somewhat imperfect, do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury; a verdict should not be set aside unless failure to do so would be inconsistent with substantial justice and reversal is not warranted when an instructional error does not affect the outcome of the trial.

*Edward G. Lennon, PLLC* (by *Edward G. Lennon*), and *Dennis A. Dettmer, PLLC* (by *Dennis A. Dettmer* and *Gary L. Hermanson*), for Alpha Capital Management, Inc.

*Kerr, Russell and Weber, PLC* (by *William A. Sankbeil, Fred K. Herrmann*, and *David R. Janis*), for Paul Robert Rentenbach and Dykema Gossett, P.L.L.C.

Before: GLEICHER, P.J., and FITZGERALD and WILDER, JJ.

GLEICHER, P.J. This action against a law firm and one of its attorneys arises from events that transpired during a separation of business partners and their joint ownership interests in a company they had owned. Plaintiff, Alpha Capital Management, Inc. (ACM), contended that its counsel, defendants Dykema Gossett PLLC and Dykema attorney Paul Rentenbach, breached fiduciary duties and committed other actionable wrongs by representing a former ACM shareholder in a dispute concerning his buyout agreement. A jury found in favor of defendants on all counts alleged in ACM's complaint. ACM appeals as of right the trial court's entry of a judgment of no cause of action effectuating the jury verdict. We affirm.

### I. UNDERLYING FACTS AND PROCEEDINGS

In 1991, Ralph Burrell founded ACM to provide financial consulting services to businesses, pension funds, and nonprofit institutions. Initially, Burrell owned 55 percent of ACM's shares and Robert Warfield owned 45 percent. Within a year, Burrell and Warfield each owned 50 percent of ACM's shares. Soon after ACM's formation, the company hired Dawna Edwards as its portfolio manager. In 1996, ACM hired Napolean Rodgers as managing director of its fixed income portfolio.

Before starting ACM, Burrell had established a successful information systems and management consulting business called SymCon. Dykema served as SymCon's general counsel. Burrell and Warfield retained Dykema in 1991 to supply the legal services necessary to form ACM. After other Dykema lawyers completed ACM's corporate formation, Rentenbach provided ACM ongoing legal services.[1]

---

[1] Rentenbach's billing records reflect that he worked the following hours on behalf of ACM from 1993 through 2001: 1993, 27.6; 1994, 8.6; 1995, 31.95; 1996, 8.3; 1997, 5.1; 1998, 34.3; 1999, 35; 2000, 13; 2001, 2.

Problems developed over time between Burrell and Warfield. They disagreed about Warfield's compensation, Edwards's equity share in the firm, and fees received by Munder Capital Management[2] (35 percent of ACM's client revenues). Because ACM "didn't grow as quickly" as Burrell thought it would, it accrued long-term debt payable to Munder Capital.[3] Warfield's compensation also created a debt. In 1998, Burrell entered into negotiations with Munder Capital seeking adjustments to the ACM-Munder Capital subadvisory agreement, and eventually achieved a lower cost structure. Warfield and Edwards wanted ACM "to move away from Munder" Capital, while Burrell hoped to expand ACM's relationship with Munder Capital.

In 1999, Burrell and Warfield began negotiating a buyout agreement contemplating that Burrell would buy Warfield's shares or vice versa. Rentenbach served as a "facilitator" during the negotiation sessions. Burrell recalled that at a meeting in mid-April 1999, Rentenbach turned to Warfield to "get approval" to answer one of Burrell's questions. Burrell felt "shocked" because "Rentenbach is the corporate attorney representing Alpha." After the meeting, Rentenbach informed Burrell that Warfield and Edwards had asked him to represent them. On April 15, 1999, Rentenbach wrote a letter to Burrell's personal counsel, former Michigan Supreme Court Justice CONRAD MALLETT, JR., advising that Rentenbach and Dykema sought to represent Warfield and Edwards

---

[2] From ACM's inception, it had a "sub-advisory relationship" with Munder Capital. Munder Capital operates as "an independent investment advisor" that manages assets for nonprofits or governmental units. Burrell explained that ACM's "business model and business strategy was to align with a firm that was in the industry, specifically, Munder, because it's very difficult to start an investment management firm."

[3] By October 2003, the debt to Munder Capital approximated $340,000.

"with respect to the negotiations that will take place regarding [Burrell's] proposed disengagement." Rentenbach requested that Burrell waive any conflict of interest that might arise from "our firm's representation of [Burrell] and his other business interest (Symcon, Inc.)." Burrell declined to waive the conflict, but Rentenbach continued to represent Warfield and Edwards. Rentenbach's billing records reveal that he proceeded to prepare draft agreements in contemplation of a buyout by one shareholder or the other, while Dykema sent ACM invoices for Rentenbach's time.

In July 2000, Burrell and Warfield signed a document entitled "Alpha Capital Management, Inc. Process for Separation/Buy-Out," which contemplated a three-phased stock purchase process. In phase I, Burrell would present an offer to Warfield, which Warfield could accept or counter. If Warfield did neither, phase II would commence, during which a facilitator would assist the parties in crafting a transaction. If that failed, in phase III Burrell would "make[] a final written offer to sell his shares to Mr. Warfield or to purchase Mr. Warfield's shares," and Warfield would "decide[] whether to buy Mr. Burrell's shares or to sell his shares to Mr. Burrell."

Phases I and II did not result in ACM's sale. On April 20, 2001, the parties embarked on phase III. In a document drafted by Burrell's counsel, entitled "Offer to Purchase and Stock Purchase Agreement," Burrell offered either to sell his ACM shares to Warfield or to purchase Warfield's shares.[4] In May 2001, Warfield elected to sell his shares to Burrell, and in June 2001 Burrell assigned to ACM his right to purchase Warfield's shares. The deal closed on October 24, 2001, and

---

[4] At this point, Honigman Miller Schwartz and Cohn represented Burrell and Rentenbach represented Warfield.

Burrell then terminated Dykema's services on behalf of ACM. Warfield, Edwards, and Rodgers continued to work for ACM.

Section 2 of the stock purchase agreement governed the "purchase price and payment" applicable to the seller's shares. Section 2.1 required an initial payment of $75,000 at the closing and § 2.2 mandated execution of a promissory note in the amount of $1,425,000, to be paid in 20 equal quarterly installments. Section 2.8 addressed what would happen if the buyer became "unwilling or unable to pay any remaining amounts owing to Seller[.]" In that event, the seller had 30 days in which to exercise an option "to obtain all ownership interests in" ACM for $1.00 "in full satisfaction of the Unpaid Amounts[.]" If the seller failed to exercise that option, "any claims of Seller to the Unpaid Amounts will be deemed to be waived and released as of the end of such 30 day period." The stock purchase agreement also contained mutual covenants not to compete effective for three years after the closing date.

In July 2003, Burrell notified Warfield that he could not make the quarterly payment required under the buyout agreement unless Warfield approved a secured loan "of up to $150,000 from SymCon to Alpha." Warfield did not respond to this letter, and Burrell did not make the July payment. On August 1, 2003, Burrell wrote to Warfield and again sought approval for a loan. Warfield replied on August 4, 2003, declining to approve the loan on the basis that "I am not required to consent to this type of a transaction under the stock buy-out agreement . . . and this arrangement is unfair to the other creditors of Alpha Capital (principally me and Munder Capital) because no other creditor has a lien on Alpha's assets." Warfield's letter continued, "Since I have not received the payment due on July 31, I hereby declare Alpha Capital in default

under the Note." On August 29, 2003, Warfield sent Burrell another letter stating in part, "Further, I am notifying Alpha and you that due to Alpha's non-payment of its obligations, my covenant not to compete with Alpha is no longer applicable, pursuant to the provisions of Section 6.1(i) of the Offer to Purchase and Stock Purchase Agreement dated April 20, 2001."

Burrell responded on September 24, 2003, informing Warfield that "by receipt of this letter . . . I am issuing a Refusal Notice pursuant to Paragraph 2.8 of our agreement." The pertinent portion of ¶ 2.8 sets forth:

> If, at any point prior to or on the date which is 45 days following the end of the 20th full fiscal quarter of the Company following the Closing Date (the "Last Payment Date"), Buyer notifies Seller, in writing (the "Refusal Notice"), that Buyer is unwilling or unable to pay any remaining amounts owing to Seller pursuant to the Promissory Note or Sections 2.4, 2.5 or 2.6 of the Offer (the "Unpaid Amounts"), Seller will have the right, upon giving written notice to Buyer within 30 days of either Seller's receipt of the Refusal, to obtain all ownership interests in the Company then owned by the Buyer (and the Guarantor, if applicable) for $1.00 paid to Buyer or Guarantor, as applicable, in full satisfaction of the Unpaid Amounts, and the parties will cooperate to effectuate a transfer of such ownership interests to Seller.

On October 10, 2003, Warfield declined to exercise his right to purchase ownership of ACM.

Rentenbach supplied legal services to Warfield, Rodgers, and Edwards both before and after Burrell notified Warfield of his inability to make the July 31, 2003, payment. Rentenbach's billing records reflect that on August 4, 2003, Rentenbach spent time drafting a default letter to Burrell. In August 2003, Rentenbach received a call from Warfield inquiring whether Burrell's missed quarterly payment rendered unenforce-

able the stock purchase agreement's noncompete clause. Rentenbach read the stock purchase agreement and advised Warfield that Burrell's breach negated the noncompete clause. On August 25, 2003, Rentenbach met with Warfield, Rodgers, and Edwards and reviewed Warfield's letter of that date to Burrell. Two days later, Rentenbach drafted an operating agreement for Alpha Partners, L.L.C. On October 9, 2003, the day before Warfield declined to purchase ACM, Rentenbach faxed to Rodgers a schedule describing the backgrounds of Alpha Partners's three founding partners: Warfield, Edwards, and Rodgers. Rodgers and Edwards resigned from ACM on October 15, 2003. By the end of October 2003, most of ACM's clients had withdrawn their funds from ACM and invested them with Alpha Partners.

On November 4, 2003, ACM and Burrell sued Alpha Partners, Warfield, Edwards, and Rodgers in the Oakland Circuit Court seeking injunctive relief and damages. Honigman Miller Schwartz and Cohn represented the plaintiffs in the Oakland Circuit Court action and Dykema represented the defendants. The plaintiffs alleged that the defendants had violated the noncompete clauses in their contracts and the stock purchase agreement, misappropriated confidential information, breached their fiduciary duties to ACM, and tortiously interfered with ACM business relationships. The Oakland Circuit Court denied injunctive relief, and the parties ultimately settled the damages claims for a relatively small amount—a $60,000 payment to ACM and Burrell.[5]

On April 28, 2006, ACM filed the instant case in the Wayne Circuit Court against Dykema and Rentenbach, alleging breach of fiduciary duty (count I), tortious

---

[5] Burrell testified in this case that he had invested approximately $300,000 in the Oakland Circuit Court litigation.

interference with contractual relations and with pro-
spective economic and business advantage (count II),
and aiding and abetting Warfield in violating his cov-
enant not to compete (count III). In June 2006, defen-
dants moved for summary disposition pursuant to MCR
2.116(C)(7) and (8). They contended that the allega-
tions in ACM's complaint arose solely from their prior
attorney-client relationship with ACM, and that the
statute of limitations barred this malpractice claim. In
the alternative, defendants argued that the plaintiffs'
release of the Oakland Circuit Court defendants in the
prior litigation, Alpha Partners, Warfield, Edwards, and
Rodgers, barred an "aiding and abetting" theory
against defendants as a matter of law. They also averred
that the covenant not to compete had dissolved before
the formation of Alpha Partners.

ACM answered that the breach of fiduciary duty
claim did not sound in legal malpractice, but rather was
properly pleaded as a separate cause of action subject to
a three-year period of limitations. ACM denied that the
release barred its claims for aiding and abetting, and
contended that the covenant not to compete remained
in effect when defendants formed Alpha Partners. The
trial court denied defendants' motion, and this Court
denied their application for leave to appeal. *Alpha
Capital Mgt*[,] *Inc v Rentenbach*, unpublished order of
the Court of Appeals, entered October 27, 2006 (Docket
No. 272819). The Supreme Court also denied leave to
appeal. 477 Mich 1059 (2007).

On May 19, 2008, a jury trial commenced. The trial
concluded on June 3, 2008, when the jury returned a
special verdict finding that: (1) defendants had not
breached a fiduciary duty to ACM; (2) former employees
of ACM tortiously interfered with contracts or business
relationships of ACM; (3) defendants did not aid or abet

the tortious interference; and (4) Warfield did not breach the covenant not to compete.

## II. SUMMARY DISPOSITION RULINGS

### A. STANDARD OF REVIEW

ACM initially contests the propriety of the trial court's denial of ACM's motion for partial summary disposition concerning its breach of fiduciary duty claim. Because the trial court considered documentation beyond the pleadings in reaching its ruling and denied the motion on the basis of the existence of conflicting questions of fact, we review the court's ruling under MCR 2.116(C)(10). *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). This Court reviews de novo a trial court's summary disposition ruling. *Id.* "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

ACM additionally asserts that the trial court should have granted a directed verdict or judgment notwithstanding the verdict (JNOV) regarding its breach of fiduciary duty count. We also review de novo a trial court's rulings on motions for a directed verdict and JNOV. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). "A motion for directed verdict or JNOV should be granted only if the evidence viewed in th[e] light [most favorable to the nonmoving party] fails to establish a claim as a matter of law." *Id.*

### B. BREACH OF FIDUCIARY DUTY CLAIM

Defendants do not dispute that they owed ACM a fiduciary duty premised on ACM's status as their

former client. See *Rippey v Wilson*, 280 Mich 233, 243; 273 NW 552 (1937) (observing that "[t]he relationship between client and attorney is a fiduciary one, not measured by the rule of dealing at arm's length"); *Meyer & Anna Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 47; 698 NW2d 900 (2005) ("Damages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed.") (quotation marks and citation omitted). Defendants insist that material questions of fact precluded a grant of summary disposition, a directed verdict, or JNOV with respect to whether they breached their fiduciary duty by working on behalf of Alpha Partners, Warfield, Edwards, and Rodgers in 2003.

Few Michigan cases elaborate concerning the substantive elements of a former client's breach of fiduciary duty claim against an attorney. ACM relies on the seminal Michigan case addressing an attorney's liability for breach of fiduciary duty, *Fassihi v Sommers, Schwartz, Silver, Schwartz & Tyler, PC*, 107 Mich App 509; 309 NW2d 645 (1981).[6] However, *Fassihi* does not resolve the question whether, as a matter of law, defendants' conduct violated their fiduciary duties.

---

[6] *Fassihi* has been described as "the preeminent case recognizing a stakeholder's claim of breach of fiduciary duty against an attorney who represents only the business." Rossman, *The descendants of Fassihi: A comparative analysis of recent cases addressing the fiduciary claims of disgruntled stakeholders against attorneys representing closely-held entities*, 38 Ind L R 177 (2005). The Massachusetts Supreme Court singled out *Fassihi* as "a well-reasoned opinion supporting" the view that "even though counsel for a closely held corporation does not by virtue of that relationship alone have an attorney-client relationship with the individual shareholders, counsel nevertheless owes each shareholder a fiduciary duty." *Schaeffer v Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, PC*, 405 Mass 506, 513; 541 NE2d 997 (1989).

The plaintiff in *Fassihi*, a radiologist, owned 50 percent of Livonia Physicians X-Ray, P.C., a closely held corporation. The defendant law firm represented Livonia Physicians and had drafted "all the agreements pertaining to membership in the professional corporation." *Id.* at 513. Dr. Rudolfo Lopez owned the other half of the corporation's shares. *Id.* at 511-512. Lopez had a prior agreement with St. Mary's Hospital that invested him with "personal and sole responsibility for staffing [its] radiology department." *Id.* at 513. Lopez and Fassihi practiced together for about 18 months before Lopez reached the decision that he no longer wished to associate with Fassihi. *Id.* at 512. Lopez asked the defendant, Livonia Physicians's lawyer, to ascertain how Fassihi "could be ousted from Livonia Physicians . . . ." *Id.* In June 1975, an employee of the defendant delivered Fassihi a letter advising that Livonia Physicians's board of directors had met in Fassihi's absence and voted to terminate his employment. *Id.* at 513. Fassihi then learned that due to his "termination" from Livonia Physicians, he could no longer practice at St. Mary's Hospital. *Id.* Fassihi filed a complaint asserting that the defendant had "represented both Lopez individually and the professional corporation without disclosing to him this dual representation." *Id.*

This Court identified the "difficult question" of first impression presented in the case as "what duties, if any, an attorney representing a closely held corporation has to a 50% owner of the entity, individually." *Id.* at 514. The Court began its analysis by adopting the proposition that "the attorney's client is the corporation and not the shareholders." *Id.* Notwithstanding that no attorney-client relationship existed between Fassihi and the defendant law firm, the Court cautioned that

this fact did not categorically preclude a fiduciary duty from arising between the law firm and Fassihi. *Id*. The Court explained:

> A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial. Furthermore, whether there exists a confidential relationship apart from a well defined fiduciary category is a question of fact. [*Id*. at 515 (citation omitted).]

The Court further noted the "difficulties" inherent in "treating a closely held corporation with few shareholders as an entity distinct from the shareholders." *Id*. at 516. "Instances in which the corporation attorneys stand in a fiduciary relationship to individual shareholders are obviously more likely to arise where the number of shareholders is small." *Id*. In these situations, "the corporate attorneys, because of their close interaction with a shareholder or shareholders, simply stand in confidential relationships in respect to both the corporation and individual shareholders." *Id*.

This Court in *Fassihi* examined whether, by virtue of "close" attorney-shareholder interaction giving rise to "confidential relationships," a distinct fiduciary relationship existed between an attorney for a closely held corporation and a shareholder. *Id*. at 516. Because Fassihi and the defendant law firm lacked an attorney-client relationship, any liability on the part of the law firm arose on the basis of a cause of action—breach of fiduciary duty—separate and apart from the defendant's breach of a traditional duty of care. Here, the parties do not dispute that defendants and ACM had a fiduciary relationship through October 2001. Consequently, *Fassihi* does not resolve the issue at the core of

the parties' dispute, whether defendants violated the fiduciary duty they owed to ACM by providing legal services to Warfield, Rodgers, and Edwards in 2003.

The common law has long recognized that an attorney's fiduciary duties extend to both current and former clients. For example, in *T C Theatre Corp v Warner Bros Pictures, Inc*, 113 F Supp 265, 268 (SD NY, 1953), the district court explained:

> A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited.

The United States Court of Appeals for the Sixth Circuit has declared it "well settled that an attorney who has acted for one party cannot render professional services in the same matters to the other party, and it makes no difference in this respect whether the relation itself has terminated, for the obligation of fidelity still continues." *United States v Bishop*, 90 F2d 65, 66 (CA 6, 1937). In *Consol Theatres, Inc v Warner Bros Circuit Mgt Corp*, 216 F2d 920, 927 (CA 2, 1954), the United States Court of Appeals for the Second Circuit held that Canon 6 of the American Bar Association Canons of Professional Ethics "is devised to protect the secrets and confidences reposed in the attorney by his clients," and required the disqualification of an attorney representing the plaintiff in an antitrust action "substantially similar" to matters on which the attorney had worked on behalf of the defendants.[7] *Id.* at 927.

---

[7] The Second Circuit in *Consol Theatres, id.* at 926, described the American Bar Association Canons of Professional Ethics as "a codifica-

These descriptions of an attorney's obligation to a former client derive from the principle that the attorney's duties of loyalty and confidentiality continue even after an attorney-client relationship concludes. But under the common law and pursuant to the rules of professional responsibility, the continuing duties of loyalty and confidentiality apply only to matters in which the new client's interests qualify as both adverse to those of the former client *and* substantially related to the subjects of the attorney's former representation. Michigan Rule of Professional Conduct 1.9(a) embodies these concepts as follows: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." An attorney does not necessarily breach his or her duty of loyalty and confidentiality to a former client by representing a new client whose interests are merely adverse to those of the former client. The attorney breaches his or her fiduciary duty to a former client only by undertaking representation of a client who has interests both adverse and substantially related to work the attorney performed for the former client.[8]

---

tion of the more important limitations on legal practice broadly deemed necessary for the protection of clients." At that time, Canon 6 read, in pertinent part:

> The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

[8] The comments to MRPC 1.7, which sets forth the "General Rule" regarding conflicts of interest, include the following observation: "[S]imultaneous representation in unrelated matters of clients whose inter-

A number of courts around the country have examined the circumstances under which an adverse subsequent representation may be deemed substantially related to legal services done for a former client. Most commonly, courts have adopted a three-part test set forth in *INA Underwriters Ins Co v Nalibotsky*, 594 F Supp 1199, 1206 (ED Pa, 1984):

> 1. What is the nature and scope of the prior representation at issue?
>
> 2. What is the nature of the present lawsuit against the former client?
>
> 3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

The district court in *INA Underwriters* further elaborated,

> In answering the first question, the court should consider both the purposes for which the attorney was employed and the facts underlying the matter for which the attorney was responsible. However, the focus should be upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform. Once the purposes for which the attorney was employed are clear, it is then possible to consider the type of information which a client would impart to an attorney performing such services for him.
>
> The second question is relatively simple to answer. All that is necessary is an evaluation of the issues raised in the present litigation and the general facts upon which the legal claims asserted in the present action are based.
>
> In resolving the third question—whether confidential information "might" have been received in the course of

---

ests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients."

the prior representation which would be substantially related to the present representation—the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information "might" have been disclosed which would be relevant to the present suit. "The lawyer 'might have acquired' the [substantially related] information in issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship." [*Id.*, quoting *Realco Servs, Inc v Holt*, 479 F Supp 867, 871-872 (ED Pa, 1979).]

Application of the *INA Underwriters* analysis to the instant facts yields a conclusion that material questions of fact precluded summary determination whether defendants breached their fiduciary duties to ACM. At trial, three witnesses testified about whether Rentenbach breached his fiduciary duties to ACM: Mallett, John Beckerman, and Charles Borgsdorf. These witnesses offered differing views regarding whether Rentenbach's work on behalf of Alpha Partners qualified as "substantially related" to the work he had done for ACM.

Mallett described the "continuing ethical responsibility" to a former client as follows:

> You have an ongoing relationship with this client. It isn't that you simply get to pick a new side at the end of the day just because you say I no longer represent you; therefore, I can represent someone whose interests are adverse to yours. It doesn't work that way.

> You can end your relationship with a client and many times lawyers do because the relationship is broken down. That doesn't mean that you can then switch sides, it just means that you can leave the field.

He opined that "the establishment of a competing firm against [ACM] would have been directly adverse to

Alpha Capital," and "I don't think the conflict gets any more direct than that." Mallett added that "if . . . two corporations are competing in the same field, competing for the same client base and delivering the same product," a corporate counsel for one company could not ethically represent the other without a waiver. During his direct examination, Mallett did not specifically address whether Rentenbach's representation of Alpha Partners and its principals had a substantial relationship to defendants' representation of ACM. On recross-examination, Mallett acknowledged his awareness of MRPC 1.7 regarding conflicts of interest and a relevant comment to the rule:

> [A] lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. *On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients.* [Emphasis added.]

Beckerman testified as ACM's primary liability expert.[9] Beckerman opined that a lawyer can represent two clients whose interests conflict only "when they consent." After an attorney-client relationship has ended, Beckerman believed that "two duties remain; one is the duty of confidentiality," and the other is "the duty of loyalty to the client[.]" Beckerman summarized the duty of loyalty as follows: "[A] lawyer may not represent a client adversely to a former client in a matter that is the same or substantially the same in which he has represented the former client unless the former client consents."

---

[9] At the time of trial, Beckerman was an associate dean at Rutgers University School of Law. He had served as a visiting professor at the University of Michigan Law School between 1997 and 2000.

In Beckerman's view, during the 2001 discussions about how to separate the interests of Burrell and Warfield, Rentenbach still had an attorney-client relationship with ACM. Beckerman concluded that in 2003, Rentenbach could not advise Warfield concerning whether to purchase ACM's stock for a dollar "because it involved a direct conflict with a former client." Beckerman explained that this conflict arose because

> Mr. Rentenbach knew every detail of [the Munder Capital] debt; how it was structured, was it secured, or unsecured. He did that work for Alpha Capital, and he could not have advised . . . Mr. Warfield. It's inconceivable th[at] he could have advised Mr. Warfield whether or not to purchase the company for a dollar without some consideration of Alpha Capital Management's liabilities including the Munder [Capital] debt.[10]

Beckerman also expressed that defendants' assistance of Warfield, Edwards, and Rodgers in 2003 constituted "a grotesque breach of their own fiduciary duties." He explained that defendants established Alpha Partners while Warfield and "Warfield's confederates" remained employed at ACM:

> [Rentenbach] did all of these things knowing that they [Warfield, Edwards, and Rodgers] were still employees of Alpha Capital Management, and knowing . . . that these people were breaching their fiduciary duties. They were starting their new company on company time, while they were still employed by Alpha. So, he was assisting them in breaching their fiduciary duties, and not only does the law prohibit a lawyer from assisting someone else in breaching their fiduciary duties, but it is clear that if a lawyer does

---

[10] The record lacks any evidence suggesting that Rentenbach possessed confidential information about the Munder Capital debt that Warfield did not also possess.

assist someone in breaching their fiduciary duties, the lawyer will be held responsible for all losses that are caused by that breach.

Finally, Beckerman opined that defendants breached their duty of loyalty to ACM by representing Alpha Partners and the individual defendants in the Oakland Circuit Court litigation.

Borgsdorf, defendants' expert witness,[11] agreed with Beckerman that "to the extent that" defendants' work for Alpha Partners might be adverse to ACM, defendants were precluded from performing legal services on matters "substantially related" to the work defendants had done for ACM. He continued, "There is [sic] lots of ways to describe this, but you cannot attack on behalf of another client, what you did for your former client. And, I saw no evidence that Mr. Rentenbach of Dykema ever did anything like that." Borgsdorf pointed out that lawyers who specialize often work for competing entities:

> There are lawyers that specialize in helping dentists set up their dental practices, and there are lawyers that might have over the course of five years set up 50 different dental practices, all in southeast Michigan, and there is no rule that requires that each and every one of those dental practices consent to this lawyer who specializes in putting the paperwork together. It would dismantle the ability of lawyers specializing from ever acting for more than one client . . . .

According to Borgsdorf, Rentenbach's legal services for Alpha Partners did not substantially relate to the work he had done for ACM. Borgsdorf described as follows defendants' work on behalf of ACM:

---

[11] At the time of trial, Borgsdorf was a shareholder with Hooper & Hathaway, an Ann Arbor firm. He had taught legal ethics at the University of Michigan Law School from 1989 through 1997.

> [A]ll that Dykema did was do the paperwork to help get another business started. It filed articles of incorporation, lawyers did that all the time. It helped fill out and perhaps file the documents by which employees of Alpha Partners could become registered with the Securities Exchange Commission. This is the kind of bureaucratic stuff that lawyers help investment management firms do all the time. There is nothing improper about that.

Given that the expert testimony diverged with respect to whether defendants' representation of ACM had a substantial relationship to the work they performed for Alpha Partners and its employees, the trial court properly denied ACM's motions for partial summary disposition, a directed verdict, and JNOV. Furthermore, applying the *INA Underwriters* factors to the evidence introduced at trial, substantial evidence supports the jury's conclusion that ACM failed to prove a breach of defendants' fiduciary duties. Neither Beckerman's trial testimony nor ACM's appellate brief identifies *any* confidential information in defendants' possession that somehow advantaged Alpha Partners. Even assuming that Rentenbach possessed confidential information concerning the Munder Capital debt, ACM neglected to explain how this confidential information advantaged Warfield. Without question, ACM and Alpha Partners had adverse interests. But Borgsdorf correctly noted that defendants apparently performed only the most routine, "bureaucratic" work on behalf of ACM, and that aside from sharing the same general nature, these legal services lack any substantial relationship to Rentenbach's activities on behalf of Alpha Partners. Accordingly, we reject ACM's position that as a matter of law defendants breached their fiduciary duties.

### C. BREACH OF COVENANT NOT TO COMPETE CLAIM

ACM next characterizes as erroneous the trial court's denial of summary disposition in its favor with respect

to the complaint count asserting that Rentenbach "aided and abetted Warfield in violating" the stock purchase agreement's covenant not to compete. The trial court found that the contractual sections at issue, §§ 2.8 and 6.1(i), gave rise to "reasonable but conflicting interpretations," and continued, "Hence, the Court further finds that they are ambiguous. It further follows that summary disposition is inappropriate since further factual development is necessary to determine the intent of the parties." We again consider de novo this portion of the trial court's summary disposition ruling. *Walsh*, 263 Mich App at 621. We also review de novo questions involving the proper interpretation of a contract and the legal effect of a contractual clause. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

A contract must be interpreted according to its plain and ordinary meaning. *St Paul Fire & Marine Ins Co v Ingall*, 228 Mich App 101, 107; 577 NW2d 188 (1998). Our interpretation of contractual language is further guided by the following precepts:

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning. [*Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997) (citations omitted).]

"A contract is said to be ambiguous when its words may reasonably be understood in different ways." *Raska v Farm Bureau Mut Ins Co of Mich*, 412 Mich 355, 362; 314 NW2d 440 (1982). The trier of fact must determine

the meaning of an ambiguous contract. *Badiee v Brighton Area Sch*, 265 Mich App 343, 351; 695 NW2d 521 (2005). However, if contractual language is unambiguous and no reasonable person could differ concerning application of the term or phrase to undisputed material facts, summary disposition should be awarded to the proper party. *Rossow v Brentwood Farms Dev, Inc*, 251 Mich App 652, 658; 651 NW2d 458 (2002).

According to § 6.1(i) of the stock purchase agreement:

> Notwithstanding anything herein to the contrary, the covenants of Seller contained in this Section 6.1 shall not apply, and Seller shall not be held liable for any breach thereof, if Buyer or Guarantor has breached the Buyer's and Guarantor's Representations and Warranties or any covenant or obligation contained in this Offer or any of the Related Agreements, including, without limitation, the obligation to pay and perform the Obligations.

Section 2.8 identifies the buyer's obligations if it is "unwilling or unable to pay":

> If . . . Buyer notifies Seller, in writing (the "Refusal Notice"), that Buyer is unwilling or unable to pay any remaining amounts owing to Seller pursuant to the Promissory Note or Sections 2.4, 2.5 or 2.6 of the Offer (the "Unpaid Amounts"), Seller will have the right, upon giving written notice to Buyer . . . to obtain all ownership interests in the Company then owned by the Buyer . . . for $1.00 paid to Buyer or Guarantor, as applicable, in full satisfaction of the Unpaid Amounts, and the parties will cooperate to effectuate a transfer of such ownership interests to Seller. In the event Seller fails to make such election within such 30-day period, such ownership interests in the Company shall not be transferred but any claims of Seller to the Unpaid Amounts will be deemed to be waived and released as of the end of such 30 day period.

ACM insists that it did not breach its "obligation to pay" under the contract because the agreement contemplated an alternative form of performance, written notice of an inability to pay, that triggered the seller's right to buy the company for $1. However, the plain language of the contract refutes ACM's interpretation. Under § 6.1(i), the covenant not to compete "shall not apply, and Seller shall not be held liable for any breach thereof," if the buyer, ACM, breaches "any covenant or obligation contained in this Offer or any of the Related Agreements, including, without limitation, the obligation to pay and perform the Obligations." This language is not reasonably susceptible to more than one interpretation, and thus is not ambiguous. Because ACM indisputably breached its obligation to pay Warfield, the unambiguous contractual term precluded its enforcement of the seller's covenant not to compete. This result comports with Michigan law, specifically the principle that " 'one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform.' " *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994), quoting *Flamm v Scherer*, 40 Mich App 1, 8-9; 198 NW2d 702 (1972). Consequently, Rentenbach correctly informed Warfield that Burrell's missed July 2003 payment justified Warfield's breach or disregard of the covenant not to compete.

In support of ACM's position, it proffers an "alternative performance contract" theory, which we reject for multiple reasons. First, the case on which ACM principally relies does not support its argument. In *McBain v Pratt*, 514 P2d 823, 824-825 (Alas, 1973), an attorney executed a marital separation agreement in which he agreed to bequeath to a trust for the benefit of his children either his law practice or $42,000, representing the current worth of the law practice. In his final will,

the attorney left the law practice to his new wife. *Id.* at 825. The Alaska Supreme Court determined that the measure of damages for the breach of the separation agreement was $42,000, holding that "the trust is entitled to damages measured according to the least onerous alternative[.]" *Id.* at 827. The Alaska Supreme Court explained that " '[a]n alternative contract is one in which a party promises to render some of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party[.]' " *Id.*, quoting 5A Corbin on Contracts, § 1079, pp 453-454 (1964). As described in *McBain* and by Professor Corbin, the alternative contract doctrine creates two or more mechanisms for performance of contractual obligations, but does not serve to excuse a contractual breach or to eliminate other contractual obligations.

Second, the contractual language here does not support ACM's contention that the parties entered into or intended an "alternative performance contract." Section 2.8 envisioned that if the buyer, ACM, was "unwilling or unable to pay any remaining amounts owing to Seller pursuant to the Promissory Note," the seller had the right to purchase ACM for $1, "in full satisfaction of the Unpaid Amounts[.]" If the seller elected not to purchase the company, "any claims of Seller to the Unpaid Amounts will be deemed to be waived and released . . . ." The plain language of this clause reflects that if ACM breached its agreement to pay Warfield, he could either elect to buy the company or simply forego further payment. These elections describe alternative *remedies* for ACM's breach; they do not create alternative methods for Warfield's performance.

In summary, the trial court improperly submitted to the jury the special question, "Do you find that Robert Warfield breached the covenant not to compete?" On the basis of the analysis described above, ACM's failure to pay under the promissory note breached the stock purchase agreement and excused Warfield from abiding by the covenant not to compete. The trial court should have decided this issue as a matter of law in defendants' favor. But the court's error affords ACM no basis for relief because as a matter of law Warfield legally competed with ACM.

### III. LIMITATION OF CROSS-EXAMINATION

ACM additionally complains that the trial court improperly limited the total time for examinations of key witnesses Warfield and Rentenbach to 1.5 hours, allowing each side only 45 minutes, an "arbitrary and unreasonable" period given that (1) the relevant facts occurred over the course of 10 years, and (2) the limitation prevented ACM's counsel from adequately cross-examining Rentenbach regarding several critical documents and impeaching him with deposition testimony. ACM further argues that the trial court erred in a related fashion by denying it an opportunity to make an offer of proof documenting the information that counsel would have elicited had the court permitted more time. We review for an abuse of discretion a trial court's exercise of its power to control the interrogation of witnesses. *People v Marji*, 180 Mich App 525, 532-533; 447 NW2d 835 (1989). "To the extent that [the court's] inquiry requires examination of the meaning of the Michigan Rules of Evidence, we address such a question ... de novo." *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002).

Pursuant to MRE 611(a), "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." In *Hartland Twp v Kucykowicz*, 189 Mich App 591, 595; 474 NW2d 306 (1991), this Court emphasized that "[t]he mode and order of admitting proofs and interrogating witnesses rests within the discretion of the trial court." The trial court in *Hartland*, on the fifth day of a trial, limited witness examinations to one hour each for direct and cross-examination, but later amended its ruling to permit defense counsel more time with one expert witness. *Id.* at 596. On appeal, this Court held, "The record shows that the trial court properly exercised its discretion in limiting the time for examination of witnesses." *Id.*

Here, when ACM called Burrell, its first witness, the trial court announced that it would limit Burrell's examination to "[a]n hour a side." The following colloquy ensued between the trial court and ACM's counsel:

> [*ACM's Counsel*]: I can't get it done in an hour, your Honor. There's way too much information. I want to lay in the predicate, *and everybody else becomes a half hour.* You know, that's—
>
> *The Court*: Okay.
>
> [*ACM's Counsel*]: I need to tell the story with him so the jury gets the overall picture. Otherwise—and *the rest of these witnesses shouldn't take long.* [Emphasis added.]

The trial court did not enforce its one-hour ruling for the examinations of Burrell. ACM's counsel questioned Burrell for approximately 4¹⁄₂ hours. Burrell's direct examination and cross-examination extended for three

days of trial, in part because the examinations were interrupted for the testimony of another witness. The parties agree that after Burrell's testimony concluded, the trial court limited the entire time for additional witness examinations to 1.5 hours, 45 minutes for each side.

During ACM's counsel's cross-examination of Warfield, counsel inquired of the trial court about the time remaining and the trial court responded, "Fifteen minutes." When ACM's counsel objected that "this is not adequate considering the serious nature—," the trial court interjected, "I know, but we're moving on. We're moving on. We've wasted a lot of time in this trial, and the next witness is gonna be an hour. We'll move quickly through these witnesses." Counsel for ACM again objected to the time limitation the next day. After citing *Hartland*, the trial court responded, "I've been appealed on this issue many times, and I've always been affirmed. I pick the amount of time for each witness. Mr. Rentenbach will be an hour and a half witness. Mr. Eaton will be an [sic] one hour witness, that's half hour [sic] for each side."

Counsel for ACM apparently examined Rentenbach for 45 minutes, and did not reserve any time for recross-examination. At the conclusion of defense counsel's examination of Rentenbach, ACM's counsel objected to the time limitation and asked if he could make an offer of proof concerning "what I intend to prove when I'm being precluded from having the opportunity to make evidence in this case by the Court's rulings." The trial court did not permit ACM's counsel to describe the testimony and exhibits he intended to offer through Rentenbach, responding, "One minute. We can't go through all that. We've got to go on back to the next witness, okay?" The following exchange ensued:

*[ACM's Counsel]*: Your Honor, you're not gonna let me make a record?

*The Court*: No, no, because I've already made—we've discussed this ad nauseum. You had 45 minutes, you have 45 minutes to ask whatever you wanted. You could have saved five minutes to come back and ask about that document about the billing.

We're going on to the next witness.

*[ACM's Counsel]*: Your Honor, case law is very clear, I have the right to make a record.

*The Court*: You've made a record, I've made a ruling.

After trial concluded, ACM filed an "offer of proof" with the court. This offer does not appear in the lower court record. However, the parties have referred to it extensively in their appellate briefs.

Under the specific circumstances presented here, the trial court did not abuse its discretion by limiting to 1.5 hours the parties' examinations of Rentenbach and Warfield. The record reveals that counsel had adequate time to develop the facts and issues at the center of the parties' dispute. Moreover, the trial court permitted ACM more than three hours for its examination of Burrell on the basis of counsel's pledge that he could complete the rest of the witness examinations in a half hour.[12]

With respect to the trial court's offer of proof ruling, MRE 103(a) provides, in relevant part, as follows:

---

[12] We emphasize our disapproval of utterly arbitrary time limitations unrelated to the nature and complexity of a case or the length of time consumed by other witnesses. Here, however, because the trial court selected a time limitation suggested by ACM's counsel, the period permitted did not qualify as arbitrary. And even if the time period selected could be fairly characterized as arbitrary, by proposing a half-hour for all witnesses other than Burrell, plaintiff's counsel waived any possible error.

> Error may not be predicated upon a ruling which admits
> or excludes evidence unless a substantial right the of the
> party is affected, and

*   *   *

> (2) *Offer of proof.* In case the ruling is one excluding
> evidence, the substance of the evidence was made known to
> the court by offer or was apparent from the context within
> which questions were asked.

Because the trial court's refusal to permit ACM to make an offer of proof may have prevented ACM from fully exercising its right to challenge on appeal the trial court's time limitations, the trial court abused its discretion by ignoring or misapplying MRE 103(a)(2) and precluding ACM from presenting its offer of proof in a manner permitted by the court rules. The trial court's need to complete witness testimony, however urgent, does not absolve it from its obligation to permit an offer of proof in accordance with MRE 103(a)(2). Here, ACM later fully preserved its claim of appeal by filing a separate offer of proof in the trial court, rendering harmless the court's ruling transcribed above.

ACM avers that the limited examinations prevented questioning of Rentenbach about several documents that Alpha Partners filed with the Securities and Exchange Commission, deposition testimony inconsistent with Rentenbach's trial testimony, and Rentenbach's involvement in drafting the covenant not to compete and a 2001 amendment to ACM's articles of incorporation. But because ACM has not explained the importance of these areas of inquiry or the manner in which their foreclosure prejudiced its case, we conclude that ACM has failed to prove that the trial court's time limitation affected its substantial rights. MCR 2.613(A).

## IV. REFERENCES TO PRIOR LITIGATION

ACM avers that the trial court improperly allowed defendants to repeatedly elicit testimony regarding the settlement of the prior Oakland Circuit Court litigation, in violation of MRE 408, and to make other prejudicial references to the merits of the Oakland Circuit Court litigation. "A trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion. The trial court abuses its discretion if its decision is outside the range of principled outcomes." *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 729; 761 NW2d 454 (2008) (citation omitted). To the extent that this issue involves the meaning of a Michigan Rule of Evidence, we consider this legal issue de novo. *Waknin*, 467 Mich at 332.

ACM moved in limine to exclude at trial evidence or references to "case evaluation settlements, judicial opinions or rulings issued in . . . the Oakland County Circuit Court." ACM maintained that the settlement-related references fell within the precluded category of evidence in MRE 408 and that the settlement-related remarks and other references to the Oakland Circuit Court litigation had no relevance to this case. MRE 401. The trial court denied ACM's motion in limine, explaining that "that other suit has [been] pled, so I believe it can be brought out," and that MRE 408 did not apply because "[t]hat rule refers to settlements in this case, not in another case[.]"

Pursuant to MRE 408:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct

or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The rationale of this rule "is that settlement discussions are best encouraged when parties can freely discuss their dispute and offer to compromise their litigation positions without fear that their settlement discussions might be used against them as evidence of the strength or weakness of their cases." 1 Robinson & Longhofer, Michigan Court Rules Practice, Evidence, § 408.1, p 587.

Here, defendants sought to introduce evidence regarding plaintiff's resolution of its prior suit against Alpha Partners, Warfield, Rodgers, and Edwards. Although MRE 408 does not directly address the admissibility of settlements with third parties, in *Windemuller Electric Co v Blodgett Mem Med Ctr*, 130 Mich App 17, 23; 343 NW2d 223 (1983), this Court held that "under MRE 408, evidence of a settlement made by a party to the present litigation with a third person is not admissible to prove liability." Accordingly, the trial court incorrectly determined that MRE 408 lacks applicability to settlements "in another case," because the rule plainly does not take into account a "prior action" exception. However, the trial court correctly observed that ACM first raised the topic of the prior litigation, including the relief sought and the ultimate case evaluation award, in eight detailed paragraphs of the complaint in this case, including the following:

44. On November 4, 2003, Alpha Capital and Burrell, represented by Honigman Miller, filed a lawsuit (denominated herein as "Alpha Capital I") in the Oakland County Circuit Court, Case No. 03-053915-CK, naming Alpha Partners, Warfield, Edwards and Rodgers as defendants. The Complaint sought injunctive relief to preclude Alpha Partners from providing services to Alpha Capital's former clients and included claims against the defendants for the misappropriation of Alpha Capital's confidential information and clients, breach of fiduciary duties, tortious interference with advantageous business relations and unfair competition.

45. The defendants in Alpha Capital I were represented in the lawsuit by Defendants [Mark] Hauck and Dykema Gossett. . . .

\* \* \*

48. The lawsuit proceeded to mediation on November 22, 2004. The mediators recommended an award in favor of the plaintiffs in the amount of $70,000, and in favor of Warfield on his counter-claim against Alpha Capital in the amount of $10,000.

49. Honigman Miller had been billing Alpha Capital and Burrell for legal representation in connection with the lawsuit on an hourly basis of $390 per hour. As of December 14, 2004, Honigman Miller had billed the plaintiffs $85,628.86, which exceeded the plaintiffs' net mediation award. During the months of November and December, 2004, alone, Honigman Miller billed Alpha Capital an additional $93,606.10.

50. The expense of the litigation was depleting Alpha Capital's resources and had become unaffordable, with the prospect of substantial additional legal fees yet to come. Even though Burrell believed that the mediation award was inadequate and did not reflect the plaintiffs' actual damages, he concluded that the plaintiffs could not afford to continue the litigation and had no choice but to accept the recommended mediation award. The defendants also accepted the mediation award.

ACM's complaint further averred that defendants' breaches of fiduciary duty "were a proximate cause of Alpha Capital's damages arising from Alpha Partner's theft of its business and of the litigation costs arising therefrom." In other words, ACM sought compensatory damages for the amounts it had expended in the prior lawsuit against Alpha Partners, Warfield, Rodgers, and Edwards.

In conclusion, because ACM's theory of the case placed the Oakland Circuit Court settlement and its attendant legal fees at issue in the instant case, the trial court did not abuse its discretion by allowing defense counsel to refer to the prior litigation on several occasions. See *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) ("It is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence."). *Id.* To the extent that defense counsel's comments may have violated the letter or the spirit of MRE 408, we conclude that any error was harmless and does not warrant a new trial. MCR 2.613(A).

### V. EXPERT'S TESTIMONY AS TO MATTERS OF LAW

ACM also submits that contrary to law the trial court allowed defense expert Borgsdorf to testify regarding legal opinions, including about contract interpretation. We again review for an abuse of discretion the trial court's decision whether to admit or exclude evidence. *Morales*, 279 Mich App at 729.

Neither side challenged at trial the legal ethics expertise of Beckerman, ACM's expert, or Borgsdorf, defendants' expert. A review of Beckerman's and Borgsdorf's testimony reveals that the experts did not disagree with respect to the ethical standards guiding

lawyers' behavior and conduct toward clients and former clients, just that the experts disputed the extent to which the relevant ethical principles applied to the facts of this case. In conformity with MRE 702 and MRE 703, the experts properly brought their specialized legal expertise to bear on the instant facts.

Concerning ACM's position that the trial court improperly allowed Borgsdorf to render legal opinions involving contract interpretation, ACM has waived appellate review of this assertion. In the course of Beckerman's testimony, which ACM introduced before Borgsdorf testified, ACM elicited over defendants' objection Beckerman's opinions about the interrelationship between §§ 2.8 and 6.1 of the parties' stock purchase agreement. As noted above, "error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Lewis*, 258 Mich App at 210.

### VI. JUROR DISMISSAL

According to ACM, notwithstanding that its counsel observed the court reporter motion to a juror and gesture "in a manner adverse to [ACM]," the trial court inexcusably refused to investigate the full extent of the improper communication or give the jury a curative instruction. However, after reviewing the record, we detect no substantiation by ACM that (1) the court reporter engaged in misconduct, (2) the reporter engaged in any conduct that affected the impartiality of a juror, (3) the trial court should have granted ACM an evidentiary hearing to further investigate any potential misconduct, or (4) the trial court's decision not to investigate further can be characterized as "inconsistent with substantial justice." MCR 2.613(A).

The entirety of the trial record devoted to ACM's counsel's allegation of impropriety by the court reporter consists of the following:

> [*ACM's Counsel*]: The Court will recall that the Court gave me the ok to move around, and during the course of the trial, the Court's court reporter—
>
> \* \* \*
>
> The problem, though, and this is what I want to address. In the course of this, Mary [the court reporter] has become very upset with me a number of times, made faces and acted disdained, corrected me in an inappropriate way and an unprofessional way, and . . . [defense counsel] had a little of that also, and I understand that.
>
> But, now what I'm concerned about, on Friday, as one of the jurors was leaving, Mary waived [sic] to him and kind of spoke to him a little bit, made some mouth movement, and I—
>
> *The Court*: I don't recall that, and I was here.
>
> [*ACM's Counsel*]: Well, you didn't see it. I saw it, and I'm very concerned about the direct impact on this trial as a result of that conduct. And, what I'm asking is that the Court dismiss Juror No. 4 as a result of that, and if we need to make a separate record on this, I want to do that.
>
> *The Court*: Any comment?
>
> [*Defense Counsel*]: I didn't see it, your Honor, and I haven't seen any inappropriate conduct by the court reporter.
>
> *The Court*: I was here and don't recall seeing any [sic] of that nature, so, that request is denied.

Even accepting ACM's counsel's perception that the court reporter occasionally had "made faces and acted disdained, corrected me in an inappropriate way," we perceive no potential substantial prejudice to ACM arising from the court reporter's conduct, especially in

light of ACM's counsel's belief that the reporter had at some points apparently done the same things toward defense counsel. MCR 2.613(A). Regarding the reporter's perceived wave and mouth motion directed at a juror, given that (1) neither the trial court nor defense counsel detected the same behavior, and (2) ACM's counsel's failed to suggest any manner in which the reporter's wave, even assuming it occurred, may have threatened the juror's fairness and impartiality, the trial court did not abuse its discretion when it declined to remove the juror. *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008). Moreover, ACM presents no authority on appeal in support of its contention that the trial court should have investigated further the court reporter and potential juror bias.[13] *Hughes v Almena Twp*, 284 Mich App 50, 72; 771 NW2d 453 (2009) (noting that "[t]he failure to cite sufficient authority results in the abandonment of an issue on appeal").

### VII. JURY INSTRUCTIONS

Lastly, ACM submits that the trial court erred in multiple respects by rejecting several of its proposed jury instructions. We review de novo properly preserved instructional errors, *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002), and consider the jury instructions as a whole to determine whether they

---

[13] ACM cites only *People v Johnson*, 46 Mich App 212, 217; 207 NW2d 914 (1973), in which this Court rejected the defendant's complaint that "a detective's silent laughter during the cross-examination of a defense witness denied him a fair trial." Although the parties in *Johnson* agreed that a detective had a bout of silent laughter during a witness's cross-examination, the trial court "found no prejudice resulting from this conduct and denied [the] defendant's motion for mistrial." *Id*. This Court affirmed, observing that the defendant had demonstrated no prejudice, and saying nothing about the trial court's responsibility to conduct an evidentiary hearing. *Id*.

adequately present the theories of the parties and the applicable law. *Mull v Equitable Life Assurance Society of the United States*, 196 Mich App 411, 423; 493 NW2d 447 (1992), aff'd 444 Mich 508 (1994). "[A] verdict should not be set aside unless failure to do so would be inconsistent with substantial justice. Reversal is not warranted when an instructional error does not affect the outcome of the trial." *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008).

After reviewing the record, we find that although somewhat incomplete and imperfect, the trial court's instructions fairly and accurately presented the theories of the parties and the applicable law. Any minor omissions or other deficiencies did not substantially prejudice ACM's case. MCR 2.613(A).

### A. COUNT I: BREACH OF FIDUCIARY DUTY

The trial court instructed the jury as follows regarding ACM's breach of fiduciary duty claim:

> In this lawsuit, Plaintiff has three claims against the Defendants. In the first claim, Plaintiff maintains that the Defendants breached their fiduciary duty to Alpha Capital Management as a former client.
>
> Plaintiff has the burden of proof on this claim and must prove that (1) Defendants at some time had an attorney/client relationship with Alpha Capital Management; (2) Defendants violated their fiduciary duty arising out of the attorney/client relationship with their former client Alpha Capital Management; and (3) that the breach of fiduciary duty by the Defendant was a proximate cause of injury or harm to Alpha Capital Management.
>
> An attorney's breach of fiduciary duty to a former client is a proximate cause of the former client's injury or harm if the attorney's breach of fiduciary duty was a substantial factor in causing that injury or harm.

Your verdict will be for the Plaintiff if you find that Plaintiff has proved all of these elements.

Your verdict will be for the Defendant if you find that Plaintiff has failed to prove any of these elements.

ACM requested the following additional instructions:

*Plaintiff's Special Instruction—Attorney's Fiduciary Duty*

An attorney has a fiduciary duty to his client. This means that he must conduct himself in a spirit of loyalty to his client, assuming a position of the highest trust and confidence. The attorney's fiduciary duty to the client does not end after the attorney-client relationship has terminated. The attorney's fiduciary duty continues to apply to a former client and encompasses two main aspects: (1) a continuing duty of loyalty to the former client and also, (2) a duty not to use confidential information that the attorney obtained during the representation of the former client to the disadvantage of the former client.

*Plaintiff's Special Instruction—Breach of Fiduciary Duty by Attorney With Respect to Former Client.*

An attorney breaches his fiduciary duty to a former client if he provides legal representation or legal advice to a new client with respect to matters which are the same as, or substantially related to, matters with respect to which the attorney provided legal representation or legal advice to the former client, the interests of the new client with respect to the matters in question are materially adverse to the interests of the former client, and the attorney has not requested and obtained the permission of the former client to represent the new client with respect to the matters in question.

*Plaintiff's Special Instruction—Substantially Related Matters.*

The legal matters involved in an attorney's representation of two different clients are "substantially related" if the factual contexts of the two representations are similar or related, or if the attorney may have obtained confiden-

tial information during the legal representation of the first client that could be relevant or useful with respect to his legal representation of the current client.

*Plaintiff's Special Instruction—Billing of Attorney's Services*

In determining when the attorney-client relationship between the Plaintiff, Alpha Capital Management, and the Defendants, Paul Rentenbach and Dykema Gossett, ended—you are instructed that an attorney's act of sending a bill constitutes an acknowledgment that the attorney was performing legal services for the client.

"Generally, a trial court may give an instruction not covered by the standard instructions as long as the instruction accurately states the law and is understandable, concise, conversational, and nonargumentative." *Central Cartage Co v Fewless*, 232 Mich App 517, 528; 591 NW2d 422 (1998); see also MCR 2.516(D)(4). But a trial court need not give a supplemental instruction if doing so would not "enhance the ability of the jury to decide the case intelligently, fairly, and impartially." *Central Cartage*, 232 Mich App at 528. Even if a requested supplemental instruction accurately states the law, a trial court does not abuse its discretion in rejecting it if the supplemental instruction adds nothing to an otherwise balanced and fair jury charge. *Beadle v Allis*, 165 Mich App 516, 527; 418 NW2d 906 (1987).

With the exception of the instruction regarding "Substantially Related Matters," ACM's proposed jury instructions accurately state the law relating to an attorney's fiduciary duty and the circumstances under which it may be breached. However, neither the existence of a fiduciary duty nor the last date that defendants performed legal services was the subject of dispute at trial. The experts for both sides testified extensively that attorneys owe their current and former clients a fiduciary duty, and that the duty prohibits the use of

confidential information obtained from one client in a manner adverse to another. The experts spent considerable time discussing whether Rentenbach's representation of ACM qualified as "substantially related" to the legal work he performed for Alpha Partners. And the parties agreed that defendants continued to provide legal services to ACM until Burrell terminated the attorney-client relationship in 2001. Because the parties never disputed the legal principles described in ACM's requested supplemental jury instructions, the instructions would not have enhanced the jury's ability to intelligently and fairly decide the case. Accordingly, the trial court did not abuse its discretion by refusing to read ACM's proposed supplemental fiduciary duty instructions.

### B. MRPC INSTRUCTION

The trial court instructed the jury as follows with regard to Michigan's Rules of Professional Conduct:

> You have heard . . . some testimony regarding the Michigan Rules of Professional Conduct, or "MRPC." When deciding whether Defendants are liable for the claims in this lawsuit, you must keep in mind that a violation of the Michigan Rules of Professional Conduct do not create the basis for a claim, nor does it create any presumption that a legal duty has been breached. The Michigan Rules of Professional Conduct are not designed to be a basis for civil liability.

This instruction applies to the facts of the case and accurately states the law. ACM correctly observes that "to the extent that any valid common law claim may happen to find a corollary" in the MRPC, the rules of professional conduct do not eliminate or render invalid a fiduciary duty claim. But we do not view the instruction given as objectionable simply because it neglected

to include this additional qualification. "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). The trial court's reading of its MRPC instruction cannot be characterized as inconsistent with substantial justice.

### C. AIDING AND ABETTING INSTRUCTIONS

Count II of ACM's complaint alleged that defendants aided and abetted Warfield's, Edwards's, and Rodgers's breaches of their fiduciary duties to ACM, and that Rentenbach's actions made him "a joint tortfeasor with Warfield, Edwards and Rodgers." The trial court instructed the jury as follows regarding this claim:

> As part of Plaintiff's second claim against the Defendants, Plaintiff also claims that Defendant[s] aided and abetted Warfield, Rogers [sic], and/or Edwards, who intentionally and improperly interfered with Plaintiff's business relationship and expectancy with existing and potential clients of Alpha Capital Management, in breach of their fiduciary duties to the company. In order to establish the underlying wrong, Plaintiff has the burden of proving each of the following:
>
> 1. Plaintiff had a business relationship or expectancy with existing clients at the time of the claimed interference.
>
> 2. The business relationships or expectancies had a reasonable likelihood of future economic benefit for Plaintiff;
>
> 3. Warfield, Rogers [sic], and/or Edwards knew of the business relationship or expectancy at the time of the claims interference.
>
> 4. Warfield, Rogers [sic], and/or Edwards intentionally interfered with the business relationship or expectancy.

5. The conduct of Warfield, Rogers [sic], and/or Edwards caused clients of the Plaintiff to terminate the business relationship or to disrupt the expectancy.

6. Plaintiff was damaged as a result of the conduct of Warfield, Rogers [sic], and/or Edwards.

Your verdict will be for the Plaintiff if you find that Plaintiff has proved all of these elements and has also proved that Defendant Rentenbach gave substantial assistance to Warfield, Rogers [sic], and/or Edwards in effecting the tortuous [sic] interference and either (1) knew that either Warfield, Rogers [sic], and/or Edwards were engaging in the wrong or (2) Rentenbach's own conduct, separately considered, constituted a breach of duty to Plaintiff.

ACM contends that the trial court should have supplied additional instructions describing in detail the nature of the fiduciary relationships between ACM and Warfield, Rodgers, and Edwards. However, ACM's lengthy proposed supplemental instructions are neither concise nor conversational. Moreover, even if they qualified as proper supplemental instructions, the trial court's failure to read them was harmless given the jury's finding that Warfield, Rodgers, and Edwards tortiously interfered with ACM's contractual and business relationships.

### D. DEFENDANTS' CONDUCT BEFORE SEPTEMBER 2003

In the instructions concerning counts II and III of ACM's complaint, the trial court limited the jury's consideration of the facts to the time period "during or after September, 2003." Although ACM correctly asserts that the evidence demonstrated that Rentenbach had conferred with Warfield, Rodgers, and Edwards in August 2003, ACM averred in at least one trial court filing that "Defendants' actions upon which the breach of fiduciary duty claim is based began in September, 2003 . . . ." "A party may not take a position in the trial

court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Czymbor's Timber, Inc v Saginaw*, 269 Mich App 551, 556; 711 NW2d 442 (2006) (quotation marks and citations omitted), aff'd 478 Mich 348 (2007).

### E. COUNT III: AIDING AND ABETTING WARFIELD'S VIOLATION OF THE COVENANT NOT TO COMPETE

ACM insists that the trial court erred by failing to instruct the jury about alternative performance contracts and other "basic legal principles of contract interpretation." However, because Burrell's breach of the stock purchase agreement precluded his enforcement of the covenant not to compete, as discussed *supra* at 610-615, ACM's argument on this ground lacks merit.

### F. INTERVENING CONDUCT OF NONPARTIES AND SETTLEMENT

ACM further suggests that the trial court committed error requiring reversal when it "failed to give . . . requested instructions regarding the legal effect of any intervening conduct of persons not a party to the action, and . . . regarding the jury's consideration of evidence of a settlement." In 2003, the Committee on Model Civil Jury Instructions deleted M Civ JI 15.05, an instruction addressing the intervening conduct of a person not a party to the action. The committee explained, "The instruction was deleted because the effect of nonparty fault is addressed in M Civ JI 15.03 . . . ." ACM did not request that the trial court give M Civ JI 15.03. Accordingly, the trial court committed no error substantially prejudicing ACM to the extent that it neglected to read the jury an intervening conduct instruction.

ACM urged the trial court to instruct the jury that it "must not consider the fact that there was a settlement in the prior case as having any bearing" on the jury's determination of ACM's claims in the instant case. Although this proposed instruction accurately stated the law, the trial court's refusal to give it was not inconsistent with substantial justice. ACM presented abundant evidence about the Oakland Circuit Court litigation, but virtually no information regarding the small settlement achieved. After reviewing the trial court's instructions as a whole in light of the evidence introduced at trial, we simply cannot conclude that the trial court's refusal to give a supplemental settlement instruction substantially prejudiced ACM.

### G. ACM'S THEORY OF THE CASE

The trial court refused to read the case theories submitted by the parties. According to MCR 2.516(A)(5), "The court need not give the statements of issues or theories of the case in the form submitted if the court presents to the jury the material substance of the issues and theories of each party." The trial court did not abuse its discretion by refusing to read ACM's lengthy and argumentative case theory because the balance of the instructions adequately explained the material substance of the disputed issues in this case. Furthermore, the parties aggressively advocated their theories of the case during their closing arguments.

Affirmed.